SEELEY *v.* PRICE.

---

### Sarah J. Seeley v. James Price.

*Mental weakness, &c., when general allegations sufficient.* General allegations of weakness of intellect in the grantor of a deed, sought to be set aside as obtained by fraud and undue influence, and also of his having indulged in the use of intoxicating liquors, to the extent of producing mental incapacity, and of the undue influence charged to have been employed, are sufficient, especially when the defendant has taken issue on the facts and gone to a hearing upon the evidence.

In cases of this kind it is very difficult to set forth specially, or to describe all the particular facts, and the various means used for obtaining the deed, even when all the facts and means are known.

A person whose senses are blunted, who is absent-minded, inattentive, and in general "childish," and also under the influence of liquor; but whom the court

could not pronounce incapable of doing an act, as to the effect of which he was fully and fairly informed, was held to have been the subject of fraud and undue influence in the execution of a deed, prepared by and executed to his son, in whom he implicitly confided; the contents and effect of such deed not having been fully and fairly explained to him.

*Duty of persons in confidential relations.* Those standing in a confidential relation to a person of feeble intellect are under a clear legal and moral duty, if not to call to his attention all the considerations and details which bear upon the propriety of the transaction, at least to avoid any effort to prevent such considerations from occurring to, or having their due weight upon his mind.

*Deed to person in confidential relation: Court must be satisfied of its fairness.* Where one occupying a confidential relation to a person of weak intellect, and in whom he places confidence, takes a benefit under a deed prepared by himself, it is the duty of courts to refuse judicial sanction to such an instrument, until fully satisfied of the fairness of the transaction, and that the instrument is the intelligent act of the person executing it.

*Heard October 10th and 11th. Decided October 31st.*

Appeal from Cass Circuit, in Chancery.

The facts are stated in the opinion.

*Muzzy & Knox,* for complainant.

1. Under the circumstances disclosed by the evidence in this case, the rule of law is plain. The defendant takes the deed clouded with suspicion. He was managing the old man in his own behalf.—*Redfield on Wills,* 131, 132, 158, 159; 25 *N. Y.* 9, 92, 95; 14 *Vesey,* 273; 4 *Barb.* 398.

2. There was a confidential relation between the parties, and a confidence actually reposed which throws the burden of proof on the defendant, and requires him to show the whole transaction.—3 *Cow.* 537; 5 *Barb.* 533; 13 *Ill.* 242; 6 *Vesey,* 287; 3 *Lead. Cas. in Eq.* 143-5.

3. It is said to require less mind to make a will than to make a contract, yet we hold, that had this been a will, we have shown a lack of testamentary capacity.—*Redfield on Wills,* 128, 130; 25 *N. Y.* 9; 12 *Mich.* 459, 490.

The law scrutinizes contracts more closely than wills.— 3 *Lead. Cas. in Eq.* 145.

*D. Blackman,* for defendant.

1. The first allegation is that John Price was unfit to do business, and almost imbecile. It is enough to say that courts

do not measure the capacity of parties. They are either *compos* or *non compos mentis.*—4 *Cow.* 207; 24 *Barb.* 386.

2. The allegation does not amount in law to a charge that John Price was *non compos.*—12 *Mich.* 459. And of the same opinion is the solicitor for the complainant, for he charges that the deed was obtained by acting upon the weakness and imbecility of John Price, who was subject to be controlled and influenced.

3. With respect to the last allegation, that defendant staid with John Price, furnished liquor and drank with him, &c. This charge is entirely disproved by the proofs. There are some two or three witnesses who say he was drunk when he signed. The following cases have a bearing on this point.— 3 *Black,* 51; 7 *Dana,* 452; 10 *Yerg.* 121; 24 *Texas,* 426; 7 *Clark, Ia.* 60; *Redfield on Wills,* 94, 126; 22 *Wend.* 526; 24 *Barb.* 584; 9 *Conn.* 102.

CHRISTIANCY J.

Complainant and defendant were the only children and heirs of John Price, and both resided in the State of Iowa. The defendant was a man of considerable property, and the husband of complainant a farmer in comfortable circumstances. John Price, the father, resided in Penn Township, Cass County, Michigan, where he owned a farm worth about six thousand dollars, which constituted substantially all his property. His first wife having been dead for some years, he married a second wife in April, 1860; he being then about seventy-four years old, and his wife some ten or twelve years younger. Both complainant and defendant seem to have been opposed to the marriage.

The old gentleman lived in a poor, not very comfortable house, and in the most economical manner, dressing very poorly, depending mainly upon renting his farm or letting it on shares, keeping little, if any stock. His wife seems to have had more regard for comfort and for dressing and appearing respectably, but, though intrusted by him to make most of the

purchases, and to do the trading, which was confined to household necessaries, she does not appear: from the evidence to have been by any means extravagant.

He had sometimes found a little fault with the amount of her purchases, but this seems rather to have sprung from a nervous apprehension of coming to want, than to any real cause, and no serious difficulty seems to have arisen between them, on this or any other account; and they appear to have lived as peaceably and to have been as much attached to each other as is usual with people of their age thus connected. He had been out to Iowa soon after the death of his first wife, and remained a year and a half, staying part of the time with his son, and part of the time with complainant and her husband, and had made them two or three visits after that time.

In December, 1862, the defendant, having been written to by his friend, George Townsend, to come and see his father and assist in arranging his business, came accordingly; and on the 30th day of December a deed was executed by the father to the defendant, conveying to him the farm. This deed purports to have been made for the consideration of one thousand dollars, but it is not pretended that any such pecuniary consideration was actually paid. The bill is filed to set aside this deed, on the ground of the incapacity of the grantor, and fraud and undue influence of the grantee, in obtaining it.

The bill alleges that the grantor had been for some time in the habit of drinking spirituous liquors to an injurious extent; that he was for several months, prior to the execution of the deed, afflicted with dropsy, "nearly imbecile," subject to be controlled and influenced by any person who could obtain his confidence, and incapable of doing business; that defendant furnished him with spirituous liquors, drank with him, and prevailed on him to deed and convey the land; that he paid nothing for it, and procured the deed by fraud, and prays that it may be set aside.

An objection is made, that the bill does not state a sufficient ground for the relief asked. The defendant having taken issue

SEELEY v. PRICE.

on the facts and gone to a hearing upon the evidence, we are
not disposed to look upon this objection with the same critical
nicety, as if taken by demurrer. In cases of this kind, where
the validity of a deed is brought in question, on the ground of
mental weakness, combined with fraud and undue influence, it
is very difficult to set forth specially, or to describe all the par-
ticular facts, and the various means used for obtaining the
deed, even when all the facts and means are known. A some-
what general form of pleading must be allowed; and the
objection being made in this stage of the case, we are disposed
to look upon the general allegations of the bill as sufficient to
admit any evidence tending to show any degree of mental
weakness or incapacity, and that the deed was procured by
means of undue influence and fraud.

Upon the question of capacity there is, as usual in such
cases, much conflict in the testimony, and considerable dis-
crepancy as to the circumstances which led to and accom-
panied the execution of the deed. And without attempting
here to set forth a full review of the evidence, we shall, as a
general rule, state only the facts which we think fairly
established by the evidence, so far as essential to the decision
of the cause.

The evidence fails to establish insanity, idiocy, or that
degree of mental imbecility which would, of itself, render the
grantor entirely incapable at the time of executing a valid
deed. He had been, till a few years before, a man of strong
mind; but he had been failing for a few years, and for some
months had failed rapidly both in body and mind. He was
afflicted with dropsy and a disease of the lungs (of which he
died a few weeks after). His feet were sometimes much
swollen; he was subject to spells of violent coughing and
choking; barely able at the time of this transaction, a part of
the time, to walk or totter about; not confined to his bed, but
compelled most of the time, and especially on the day of the
execution of the deed, to recline upon a lounge.

His senses were blunted; he was hard of hearing; his mind

14 MICH.—2 s.

enfeebled by age and disease to an extent proportioned at least to his physical decay. He was absent-minded, somewhat listless and inattentive; his memory uncertain, fitful and capricious—in one word (to use the language of most of the witnesses) he had become " childish." He had not generally been an intemperate man in the use of intoxicating liquor, but for a little time previous to this had resorted somewhat to its use, probably to relieve his sufferings and to keep up his failing strength ; and on some recent occasions had taken too much. On the day when the deed was executed there is very strong reason for believing he was under its influence, to an extent which rendered his mind somewhat less clear, and his judgment less reliable than it otherwise would have been. But we are not satisfied that he had been furnished with the liquor or induced to drink by the defendant, or through his procurement.

Though we think he was capable at the time of understanding the nature of a business transaction, like that in question here, when properly explained to him, and the necessary effort made to impress it upon his mind, yet he was liable to fail in a fair appreciation of all its bearings, and to overlook many considerations which would properly influence men of a sounder judgment. He was, therefore, in our opinion, peculiarly liable to be imposed upon by those in whom he confided. This condition imposed upon all those who should deal with him the clear moral duty—if not to call to his attention all the considerations and details which would naturally operate upon the mind of a prudent man in deciding upon the propriety of the transaction—at least of avoiding any effort to prevent such considerations from occurring to, or having their due weight upon his mind.

But, whatever may be the nature or extent of this duty on the part of others, we think it a clear legal duty resting upon one standing in a confidential relation to a person in this condition, and taking a benefit under a deed prepared by himself, and executed in reliance upon his fidelity. And the duty of

courts is equally clear to refuse judicial sanction to such an instrument, until fully satisfied of the fairness of the transaction, and that the instrument is the intelligent act of the person executing it.—*Delafield v. Parish*, 25 *N. Y.* 9–35; *Breed v. Pratt*, 18 *Pick.* 115; *Barry v. Butlin*, 1 *Curteis Eccl. R.* 417; *Crispell v. Dubois*, 4 *Barb.* 398; *Newhouse v. Godwin*, 17 *Id.* 236; *Hughes v. Meredith*, 24 *Ga.* 325.

The defendant stood in this confidential relation to his father. He had, as he claims, been sent for by the father to come and assist in arranging his affairs. He went with one George Townsend, his confidential friend, who seems to have acted to some extent as an agent both of the father and son. Taking their own version of the affair, they called upon the old gentleman at his house, and Townsend told him that James (the defendant) had come to fix up the business; he replied he was glad of it, and said he wanted to deed James the place; wanted him to pay the debts and take care of him and the old lady. In what manner this was to be done, whether the deed was to be conditioned for the support of the old gentleman and lady, or whether he was to give back a contract or security for this purpose, neither of them gives any satisfactory explanation, nor have they undertaken to show how the old gentleman understood the proposed arrangement in this respect.

This conversation took place, they say, out of doors, and they then went into the house and stated to the old lady what they had talked of, and defendant says he told her they (the old gentleman and herself) were to go and live with him; she said she was willing and wanted some money to go and visit her daughter or sister before she should go away, and he told her she should have it. The old lady says, as to this interview (and in this she is not contradicted), that defendant and Townsend said, they (meaning herself and husband) had had a hard time, and they had come to put them in easier circumstances; that James (the defendant) proposed to take them (the old people) home

with him, and build a house for them, if they did not wish to live with him; and that she told them, if he would pay the debts and furnish her one hundred dollars to go and visit her children, and give her some corn then on the place, which the old man had given her, she would go; that defendant said he would do so, and the papers should be drawn stating what he agreed to do. This statement that the papers were to contain the agreement is in some measure corroborated by the notary who was called upon to take the acknowledgment of the deed. It is also in proof, and not contradicted, that on the day of this interview Townsend and the defendant were in the stable, and defendant there said to Townsend, "now is the time to get the farm before it has to be sold for the payment of debts;" said he wanted to get his father away from his wife; that while they were talking in the house about making the deed, some one asked James if his father was not going to let Seeley (complainant's husband) have any thing, and defendant said not to mention it to his father, for his father did not think Seeley was capable of taking care of it.

The defendant went home with Townsend that day and staid with him over night. The next morning both came over again with Alexander, a notary.

The old gentleman, as all the witnesses agree, was at this time weaker and more unwell than usual; lying upon a lounge most of the time, having, as Townsend and the defendant say, a bad spell, a choking spell, and, as some of the witnesses say, under the influence of liquor. Still he was able to get up, and did, it seems, walk out of doors that day for a little while, but came back exhausted and laid down again upon the lounge.

When Alexander (who is admitted on all hands to be an honest and intelligent witness) came to the house he found that the deed had not been written. "Some question (he says) arose whether the deed with a condition in it would be legal. This talk was between George Townsend and the defendant, and I think the old lady participated. I do not recollect what

the condition was as to the maintenance. The conclusion was they would not make the deed then, but would go to Cass (meaning Cassopolis) and get a deed made." He also says the question was about her maintenance and how it should be written in the deed.

The defendant and Townsend went to Cassopolis and returned at evening with a deed ready drawn, and the notary, who in the mean time had gone home, returns again to take the acknowledgment. John Price is still on the lounge: very little conversation is had. Nothing is said now in reference to the form of the deed they had brought for execution, nor whether it contained any provisions for maintenance.

The deed is not read, either to or by the old gentleman, or the old lady. Being requested to sign the deed, he gets up, or is helped up from the lounge (it is not certain which). He and the old lady execute and acknowledge the deed, and immediately after they are invited into another room, by defendant and Townsend, and treated with whiskey.

Some four or five days after he is taken over to George Townsend's, away from his wife, where he remains a few days, and is then taken by defendant to Iowa, where he soon dies.

This deed turns out to be a simple ordinary warranty deed, without any condition whatever, and without a word on the subject of maintenance. No paper is executed by the defendant, either to the old gentleman or his wife, providing for the support or maintenance of either, or for the payment by him of anything whatever (except two notes presently to be mentioned). And though the old gentleman may have been willing to trust himself entirely in the hands of his son, and though an attempt is made by the defendant to show by his own testimony, and that of Townsend, that the reason for going to Cassopolis to get the deed made was, because Alexander did not know how to make the deed *without* a condition, though he could have made it with a *condition for maintenance;* we are entirely satisfied that the reason why Alexander did not draw the deed at the first interview was,

because it was then understood that it was to be drawn with such condition, for which he felt himself incompetent. It is apparent, from the testimony, that the old gentleman was actuated by proper and kind feelings towards his wife; that though apparently indifferent as to himself, he was solicitous that her maintenance should be provided for in the arrangement; and, from the evidence and the whole transaction, we think the fair inference is, that he supposed her maintenance was to be, and was provided for in the deed he executed, or if not in the deed, at least in some other way, as a part of the arrangement.

But the only provision made for the old lady was one hundred dollars, in two notes of the defendant, of fifty dollars each, payable, the one in one year, and the other in two years, without interest; a sum wholly inadequate for her support, and in no reasonable proportion to the old gentleman's property; and if, as asserted by the defendant and Townsend, she had, after first assenting to go with her husband to live with defendant, afterwards concluded not to go, but to remain and live with her relations, this sum becomes still more grossly inadequate for her maintenance. But we are by no means satisfied that there was any such change from the first understanding, or that she ever assented to leave her husband and live separate from him. When she consented to go with her husband and live with defendant, she wanted, and defendant had agreed to furnish her, one hundred dollars to go and visit her relatives before she should leave; and we are satisfied that the one hundred dollars mentioned in defendant's notes was understood by her, and probably by the husband (if he knew any thing of it), as given for this purpose. At the time of this transaction she was suffering with a broken shoulder, and compelled to take opium to relieve her pain; and we are disposed to believe her when she says, she "took the notes because all she wanted was rest," and we think she, as well as her husband, supposed her maintenance was provided for in the deed.

SEELEY *v.* PRICE.

It is evident, from all the testimony, that the old gentleman placed the most implicit confidence in the good faith of his son; in fact, he seems to have resigned himself passively into his hands. When called upon to execute the deed, he did not read it nor inquire into its contents. The defendant, so far from making any effort to explain the terms, or to call to his mind the various considerations which ought to influence him, when parting with all his property by a deed, which was but a substitute for a testamentary disposition, actually takes pains to prevent others from calling his attention to the fact that he had a daughter then absent, who, for aught that appears, had equally valid claims upon his bounty; he forbids her name to be mentioned in the hearing of the old man, and gives a most absurd reason for it; instead of endeavoring to make him understand the terms of the deed, which conveys to him all the father's property, he resorts to a course which, to say the least, was calculated to mislead him into the belief, that it contained essential provisions which had purposely been left out.

We think the deed was obtained by undue influence and fraud, and should be set aside as void. The decree of the court below to this effect must be confirmed, with costs.

There is evidence that defendant paid some of the debts of his father. This will be a proper matter for settlement, in the Probate Court, in settling the estate.

CAMPBELL and COOLEY JJ. concurred.

MARTIN CH. J.

I discover no fraud or undue influence, employed by Price to procure the deed from his father. I cannot, therefore, agree with my brethren in affirming the decree of the Circuit Court.