REBECCA J. SMITH v. THOMAS CUDDY.

*Deed—Cancellation—Confidential relations—Undue influence—Burden of proof.*

1. The question in this case is held to be not whether the complainant was mentally competent to execute the deed sought to be set aside, but whether she intended at the time of its execution to make a final disposition of the land conveyed to defendant, which latter question is answered in the negative.

2. It is further held:

  *a*—That, under the circumstances of this case, the burden was upon the defendant to show not only that the complainant fully understood the terms, import, and effect of the instrument, but, if her intention was as expressed therein, to show that such intention was not produced by undue influence exerted by himself.

  *b*—That transactions of this nature are regarded by courts of equity with suspicion, and scrutinized with vigilance, the presumption being against their propriety; and it is the duty of courts to refuse judicial sanction to such an instrument until fully satisfied of the fairness of the transaction, and that it is the intelligent act of the person executing it; citing *Seeley v. Price*, 14 Mich. 541; *Witbeck v. Witbeck*, 25 Id. 439; *Wartemberg v. Spiegel*, 31 Id. 400; *Barnes v. Brown*, 32 Id. 146; *Jacox v. Jacox*, 40 Id. 473; *Duncombe v. Richards*, 46 Id. 166; *Finegan v. Theisen*, 92 Id. 173.

Appeal from Allegan.   (Hart, J.)   Argued June 14, 1893.   Decided July 26, 1893.

Bill to set aside a deed. Complainant appeals. Decree reversed, and one entered for complainant. The facts are stated in the opinions.

*C: R. Wilkes,* for complainant.

*George L. Yaple,* for defendant.

McGRATH, J. This is a bill filed to set aside a deed given by complainant to defendant. The parties are brother and sister. Complainant is 68 years of age, and defendant 65. He is an only brother, and she an only sister. They came to this country in 1849, and settled in Nottawa township, St. Joseph county. They had $1,000, which was derived from their father's estate, which sum he invested in his own name in farm lands, upon which they lived together 10 or 11 years, at the end of which time complainant married one Brown, and went to Wayland, Allegan county. Her husband acquired the land in controversy, and died without issue some 15 or 20 years ago. Prior to his death, he conveyed this land to complainant, and she has ever since continued to live thereon. In December, 1888, complainant married Alonzo Smith, who lived with her on the farm until December, 1890, at which time they separated. The immediate cause of the separation was Smith's anxiety to visit some relatives in the West. He claimed that at the time of their marriage it was understood that he should make this visit. He had been at work upon the farm since their marriage, but had had very little money. She was penurious, and objected strenuously to his going. He was determined, and she said that if he went he need not return. Defendant was called in, articles of separation were executed, and Smith went west, remaining absent about three months. While there he wrote a letter to defendant and one to his wife. Neither was answered. Complainant informed her brother of the receipt of the

letter to her. He advised her not to reply, and she acted on his advice. On December 26, 1890, defendant wrote to complainant as follows:

"*Dear Sister:* I received your letter a few days ago. Were glad to hear that you were well. I was surprised that you got a letter from Alonzo. I hope you will be careful enough not to answer it, or give him any encouragement to think that you have any respect for him. I consider him a regular sponge, that intends to beat his way if he possibly can. Little by little he will encroach on you, until you get tired or ashamed, and then he will think he has done something smart. Return his letter, or in some way give him to understand that he cannot impose on you any longer."

Smith returned to Wayland, March 7, 1891. On that day defendant was at his sister's house, and while there some person stopped at the gate and reported Smith's return. Defendant says that he informed his sister of the fact; that she manifested some surprise; that he said to her: "You need not worry about it or feel bad. If you don't want to see him, you can fasten the door." Complainant says that he told her that, if Smith came there, to lock the door, and not let him in. On the same day, while defendant was on his way to the depot, he met Smith on the road, asked him where he was going, and Smith said he was going to see his wife. Defendant told Smith that according to the papers which had been prepared he had no wife; "I says, 'I forbid you going there to disturb that woman.'" After leaving Smith, defendant told Spielmacher, who was employed on the farm, and who was taking defendant to the depot, that if Smith came to the house, and Mrs. Smith did not want him there, to put him out, and he would pay all it cost. Smith called at the house twice that day, but found the door locked.

The deed in question was executed March 13, 1891. On the next day after the execution of the deed, Smith called at

his wife's house, and found defendant there. Defendant says of this interview:

" I heard talk in the other room, and after I got through eating breakfast I went in there. Mr. Smith was there, and he said to me: 'I come here to see Jane, whether she wanted me to come back. I feel as though I have an obligation resting on me without I hear from her own hand and her own mouth that she don't want me back any more. I feel guilty, and I would like to see her.' I said, 'All right, I will ask her to come in here.' I went to the barn, and asked Mr. Morris to come to the house and hear what would be said and done. So he came to the house, and opened the door between the two rooms. I said to sister, 'Mr. Smith is here, and would like to talk with you.' She came into the room, and he said, 'Jane, I come to see if you wanted me to came back and live with you.' 'Well,' she said, 'I guess not. It would not be long before the same old trouble would be up again.'"

Smith left the house, and did not appear there again until March 20, 1891, when complainant went to the house where he was staying, about a mile and half distant, told him that her brother had been defrauding her, and solicited him to return and live with her; and they together returned to the farm, where they have since lived. Except as stated, from the time of his return to Wayland, Smith had not seen his wife, nor had they communicated with each other, until March 20, the date of his return to the farm. Within a very few days after the execution of the deed; and before complainant had seen her husband, except at the interview when defendant was present, she learned of the nature of the paper executed, repudiated it, and declared that she had been deceived.

It is evident from this record that the deed was executed in consequence of Smith's reappearance. Complainant insists that she had been informed by her brother that the purpose of Smith's return was to get her property, and that the object of the paper was simply to protect her; that

she was advised by her brother to have papers drawn up giving him control of the place, so that he could keep Smith off; that she acted upon his advice; that she did not understand what kind of a paper her brother wanted for the purpose stated, but left it with him to determine, and that she did not understand that she was parting with the power of control over the property. Defendant insists that his sister had on several occasions expressed the intention that he should have her property upon her death; that the first conversation with her with reference to the execution of the deed was on the forenoon of the day upon which it is dated; that two days before that time he received a letter from her, which letter is alleged to have been lost, in which she stated that she had heard from her neighbors that there was a new law whereby a husband inherits half of the property of his wife dying without issue; that he called upon the judge of probate, who informed him that the statute did not interfere with the right of the wife to dispose of the property as she wished; that he then visited his sister, told her what the judge of probate had said, and they together went to the village, and the deed was executed and delivered.

The allegation of the answer that the conveyance was made in consideration of an indebtedness is wholly without support in the proofs.

There was nothing said in the interview with the scrivener who prepared the deed as to a purpose on her part to make a final disposition of the property, nor any expression of a desire to make her brother her beneficiary. She did, however, refer to Smith, and her troubles with him, and in the course of the conversation said that "if she could not trust it to her brother, she could not trust anybody." Some of the language which the scrivener says he used in explaining the instrument to her was calculated to convey the impression that the paper was what she supposed it to be. While

he says that he told her that she would have the use of the farm during her life, and at her death it would be the property of her brother, in the same connection he told her that "she could do as she pleased with it," and that "it would interfere in no way in her managing the property and controlling it during her life." He says that Cuddy "was the one that did the heft of the talking."

The language of Mr. Justice Cooley in *Duncombe v. Richards*, 46 Mich. 166, 171, is applicable here. Referring to the magistrate who prepared the paper, he says:

"His evidence shows clearly that defendant was the principal actor in procuring the assignments to be made, but it also shows that the magistrate believed the intestate knew at the time what he was doing. But if the magistrate suspected no wrong,—and apparently this was the fact,—he might easily have supposed he saw evidences of intelligence which were only apparent, not real."

The question in the case is not whether complainant was mentally competent to execute a deed, but it is rather whether she intended at that time to make a final disposition of this property; whether she fully understood the import and effect of the instrument which she did execute. Until after the execution of this deed the relations between the parties were most amicable. Her brother had always been her confidential adviser. She had the utmost confidence in him. After the death of her first husband, and until this time, her brother had directed her affairs and the conduct of the farm, even to the smallest details. It was her brother who selected not only her tenants, but her employés, who made the terms and directed what should be done, even as to what crops should be raised upon the different parcels of land. He had possession of whatever notes she held, and looked after her collections generally. He visited the farm frequently, every month, as was admitted, and gave directions. She relied implicitly upon him, and invariably replied with reference even to matters

relating to the conduct of the farm that it "would be as Tom said." She was penurious, and grew more so as she advanced in years. She was unacquainted with business, was erratic, excitable, and not strong mentally. Her brother knew this. Spielmacher says that defendant "told me when I went there I should not pay much attention to her; I should go on and do what was right; and keep on doing so. He said if she said anything out of the way, or would offend me, to pay no attention to it." When complainant demanded a reconveyance from defendant he refused to give it, giving as a reason, "because as a brother I cannot see you robbed." She replied, " 'Well, I will make you do it,' and I said, 'Well, perhaps you will, but if you attempt to act very foolish it may be necessary to have a guardian appointed for you.'" She had absolutely refused to let Smith have the money with which to go west, but it was her brother who suggested letting him go, giving him $300 in consideration of his work upon the farm, and the preparation of the articles of separation, and she at once consented. After Smith's departure she went to the village, to have prepared a lease of the farm to W. Spielmacher had telegraphed to defendant of her intentions, and defendant met her at the village, objected to a lease to W., suggested a lease to M., and the same was executed. In every instance his will dominated hers. She was doggedly obstinate with others, but in his presence she had on all occasions acted on his suggestion. No instance is mentioned in which his wishes and directions were not acceded to. There is no room for the suggestion that Smith had induced her to regret the disposition of her property, and change her mind. She repudiated the transaction before any conference with Smith, and as soon as she learned that the paper executed was irrevocable, and vested the title in her brother absolutely.

Under the circumstances of this case, the burden was

upon the defendant to show not only that complainant fully understood the terms, import, and effect of the instrument executed, but, if her intent was as expressed by that instrument, to show that such intention was not produced by undue influence exerted by himself. *Gibson v. Jeyes,* 6 Ves. 266; *Huguenin v. Baseley,* 14 Id. 273; *Hoghton v. Hoghton,* 11 Eng. Law & Eq. 134. Defendant's testimony fails to satisfy us upon either. point. Transactions of this nature are regarded by courts of equity with suspicion, and scrutinized with vigilance. The presumption is against the propriety of the transaction, and, as has been frequently said in our own cases, the duty of courts is to refuse judicial sanction to such an instrument until fully satisfied of the fairness of the transaction, and that the instrument is the intelligent act of the person executing it. *Seeley v. Price,* 14 Mich. 541; *Witbeck v. Witbeck,* 25 Id. 439; *Wartemberg v. Spiegel,* 31 Id. 400; *Barnes v. Brown,* 32 Id. 146; *Duncombe v. Richards,* 46 Id. 166; *Jacox v. Jacox,* 40 Id. 473; *Finegan v. Theisen,* 92 Id. 173.

In *Jacox v. Jacox,* Mr. Justice GRAVES says:

"The actual conduct of relatives and others at the time in question towards the individual is generally of much greater value as proof of their conception of his mind or capacity than any term they may employ on the stand to express it."

In the present case, the best evidence of the incapacity of the complainant in matters of business was the almost absolute control which defendant assumed and exercised over her business affairs. Continuing, Mr. Justice GRAVES says:

"In case it appears from the facts that there was mental disorder, but not of a high degree or far advanced, it then becomes material to inquire into the nature of the transaction, and the influences leading to it; and if the circumstances disclose that the person under the infirmity, whether

through choice, accident, or otherwise, was as matter of fact for the time being in the place of ward of the other party, or was by his own consent, however brought about, in a state of submission to the judgment or opinion of the other, a presumption will arise adverse to the justice and equity of the bargain, and the bargainee will be required to show that no advantage was taken, and that in itself the arrangement was not only suitable, fair, and conscientious, but one expedient under the circumstances, and conducive to the interests of the other."

The decree below must therefore be reversed, and a decree entered here for complainant, ordering a reconveyance, the decree to stand in lieu of such reconveyance until the same is made, with costs of both courts to complainant.

HOOKER, C. J., LONG and MONTGOMERY, JJ., concurred with MCGRATH, J.

GRANT, J. (dissenting). I cannot concur with the conclusion reached by my Brother MCGRATH. The proof fails to establish a case of mental incompetency on the part of complainant to execute the deed. The record is equally barren of any evidence establishing any false or fraudulent representations made by defendant to her as an inducement to execute it.

If the deed was read and explained to her at the time of its execution, she cannot now be heard to say that it is different from what she then understood, or that its effect is otherwise than she supposed. She had both executed and received deeds before, and there is no doubt but that she fully understood their form and effect. The provisions of this deed are of the simplest character. It conveyed the fee to him, but retained a life-estate to her, with the entire use and control of the land during her life. She testified that she had always intended that this land should go to her brother, and she frequently so stated to others. He had befriended and aided, by advice and

otherwise, both her and her first husband. He had counseled and advised her since his death, and it is not shown that in a single instance his counsel was unwise, or was prompted by selfish motives. During a long life there had been nothing to mar their intimate and friendly relations until after the execution of this deed. It was natural that she should seek his counsel and advice after the death of her husband, and equally natural that he should give it. She and her second husband, Smith, had had serious trouble, and separated, and had not become reconciled when the deed was made. She had before that learned that upon her death Smith would inherit one-half of the land, if she should die seised of it. It was therefore entirely natural that she should execute the deed in accordance with her previously declared intention.

In reply to a leading question from her counsel she said that defendant asked her for a deed.

"*Q.* To keep Smith off?
"*A.* To keep him off the farm. Well, I supposed that was all it was going to amount to."

This is all the representation or inducement to which she testified.

Her marriage with Smith had proved unfortunate. They had quarreled, drawn up articles of separation, she had given him some money, and he had gone to his own children, in the state of Washington. In these troubles defendant had taken no part, except as he was requested to by either complainant or her husband. After Smith's return, defendant acted in her interest, and all he did was prompted by a sole desire to properly guard her rights.

Complainant, after some evasion, admitted that the deed was read over to her by the scrivener who drew it. She does not deny that he explained it to her. The scrivener, a man of excellent character, testified that he read the deed to her before she executed it, and explained it to

her, telling her that she would have the entire use and control of the land, and that at her death it would belong to her brother.

This land, constituting a farm of 160 acres, had been her homestead since she was married to her first husband. She had no intention of selling it, but intended to keep it as long as she lived. She occupied a portion of the house, and rented the rest to her tenant who worked the farm. The farm and what money she had furnished her a comfortable living. She had no children, and, aside from Smith, the defendant was her sole heir. Under these circumstances, there was nothing unnatural in this disposition of her property. This is, therefore, not a case where the grantee must assume the burden of showing competency and absence of undue influence. There was no relation of trustee and *cestui que trust*.

Admitting all the evidence on her part to be true, and it has no tendency to sustain the claim of undue influence. In order to establish a case of undue influence, there must be a wrong-doer to be resisted, and one incapable of resisting and understanding and protecting his interests. *Latham v. Udell*, 38 Mich. 238, 241. It was there said:

" We do not know of any rule of law or of morals which makes it unlawful or improper for a wife to use her wifely influence for her own benefit or for that of others, unless she acts fraudulently, or extorts benefits from her husband when he is not in a condition to exercise his faculties as a free agent."

This language is applicable to the present case. A brother is justified, both in law and in morals, to influence a sister whom he has aided, as in this case, to make provision by which at her death he may receive the property. Complainant, at the time of making the deed, was under no moral obligation to Smith, with whom she was not then on friendly terms. It is unnecessary to determine what influence operated to suddenly embitter her mind

against her brother.  She said to the scrivener that she could trust her brother.  This statement was prompted by long experience, and the defendant has since done nothing to show that her confidence was misplaced.

The decree should be affrmed, with costs.