*In re* SADLER'S ESTATE.

SADLER *v.* SADLER.

1. BANKS AND BANKING—JOINT DEPOSITS—OWNERSHIP—SURVIVORSHIP—STATUTES.

Where a fund was deposited in a bank in the joint names of mother and son, payable to either or the survivor, in the absence of evidence to the contrary, section 3, Act No. 248, Pub. Acts 1909 (2 Comp. Laws 1915, § 8040), fixes the

ownership of the fund in them as joint tenants, with the attendant right of survivorship.

2. SAME—APPEAL AND ERROR—HARMLESS ERROR.

In proceedings by the administrator of a mother's estate against the estate of her son for the value of certain certificates of deposit in the joint names of mother and son payable to either or the survivor, where the evidence shows that these certificates were renewed from time to time, and understandingly indorsed by the mother, the statute establishes the ownership, and the questions of gift *inter vivos* and undue influence, claimed to have been erroneously submitted to the jury become unimportant, since the jury found in defendant's favor.

3. TRIAL—INSTRUCTIONS—BURDEN OF PROOF—FIDUCIARY RELATIONS.

Refusal of repeated requests to charge that the burden of proof rested upon defendant to show that there was no undue influence by reason of the fiduciary relations existing between mother and son was not erroneous, where the question was properly covered by the general charge and twice repeated to the jury when they returned for further instructions.[1]

4. SAME—INSTRUCTIONS.

Where one of the jurors asked the court as to the use they might make of the fact that there was undue influence in regard to the deeding of certain land to defendant by his mother, not in issue in the case, the court was not in error in responding that they had nothing to do with the land in their verdict; that they could only consider that as bearing upon the question in issue; that if they found influence was used in the deeding of the land, it would not of itself show that influence was used in the other matters; and that they would also have to find influence was used as to the certificates of deposit and the notes.

Error to Ottawa; Cross, J. Submitted October 18, 1917. (Docket No. 11.) Decided June 3, 1918.

Charles M. Abbott, administrator of the estate of Phila M. Sadler, deceased, presented a claim against the estate of Franklin Sadler, deceased, for the amount of certain promissory notes and certificates of deposit.

[1]See note in 35 L. R. A. (N. S.) 944.

The claim was allowed in part, and plaintiff appealed to the circuit court. Judgment for plaintiff for less than amount claimed. Plaintiff brings error. Affirmed.

*A. E. Ewing* and *Smedley & Linsey,* for appellant.

*Lillie, Lillie & Lillie,* for appellee.

STEERE, J.   The parties out of whose estates this litigation arose were mother and son.   Phila M. Sadler died on December 23, 1912, then upwards of 79 years of age.   Franklin Sadler died March 25, 1914, well past middle life, leaving a widow to whom he had been married over 40 years, and two grown children. This proceeding was commenced by the administrator of her estate filing a claim against his estate in the probate court of Ottawa county on July 28, 1916, consisting of numerous items for amounts of money claimed to have belonged to her and received by him while assisting her in business matters, with interest thereon, aggregating over $5,000.   At the hearing before the commissioners on claims in the probate court but two items of said claim were allowed, with interest, amounting to $277.51.   On appeal taken by the administrator of Phila M. Sadler's estate to the circuit court of Ottawa county a retrial by jury resulted in a verdict of $254.80.   The case was then removed to this court by writ of error, appellant's numerous assignments condensing into the two propositions that the court erroneously refused to instruct the jury as requested in various particulars, and in the charge as given.   Upon the trial in the circuit court, as stated by the court in his charge and not denied, all items of plaintiff's claim as filed in the probate court were abandoned except for three bank certificates of deposit—one for $2,400, one for $400 and one for $80,— $98 in cash and a note given her by one Abbott for $156.80.

Phila M. Sadler, and her husband, Henry, who died in 1915, aged over 90 years, were pioneers of the township of Wyoming in Kent county, where they owned and resided upon a farm of 80 acres during most of their married lives. They had three children who arrived at maturity and were married—a daughter yet living, a son Edwin who died in 1908, leaving a wife, grown son and daughter, and Franklin against whose estate this claim is filed.

Briefly stated, as bearing upon the relations and situation of the parties, the testimony shows that as they approached old age and their children had grown up and married, the parents made an arrangement with Edwin, the oldest of the two sons, to live with or near them and run their farm, they making out to him a deed of 40 acres of it, upon which they retained a life lease, placing said deed in escrow, at the same time making another deed, which they also placed in escrow, of the other 40 acres of their farm to their son Franklin, who lived upon his own place in the adjoining county of Ottawa, but not far from the home of his parents. Edwin moved with his family onto the 40 acres designed for him, built a house upon it in which he lived, working the whole farm and giving his parents a third of the proceeds. In 1907 he sold his personal property and went west, but soon returned and remained upon the place until he died. After his death his widow continued to live upon the 40 for a season, attempting to carry on the farm as her husband had done. While she yet remained on the place the deed to Edwin which had been in escrow for him was taken up and destroyed, and a new deed running to her was put in escrow instead. She remained upon the place for near a year, then remarried and went away to Canada. The deed to her in escrow was destroyed before she left the farm and a new deed of that 40 running to Franklin was put in escrow.

There is testimony indicating on the one hand that Franklin induced his parents to make this change in his favor, and on the other that it was done because Edwin's widow was about to remarry and leave the old people and place, as she soon did.

Little is shown as to Henry Sadler's activities and he only figures in this controversy incidentally, but it does appear that his wife Phila for many years was the active manager of their home and business affairs, looking after the farm, hiring men, renting fields, selling produce, making purchases, doing the banking, loaning money, etc. They lived their long lives together in harmony so far as shown, were apparently forehanded and reasonably prosperous. She had money which she handled as her own, making deposits in banks and loans in her own name. Her husband who survived her is not shown to have claimed any interest in it and her ownership of the amounts in controversy here is not questioned. Until Edwin's death the old people depended upon him for such help and counsel as they needed or desired. After his death they looked to and consulted with Franklin for filial attention, aid and counsel as occasion arose. It is plaintiff's claim that they had confidence in him, depended upon him, deferred to his judgment, and were largely influenced by him in their views and conduct; that after his mother became mentally and physically enfeebled by age and ill health he took advantage of such fiduciary relations to unduly influence her to put into his possession her bank deposit certificates, notes and money, and permit him to manipulate them, taking renewals of paper in the name of both, or to the survivor, so that upon her death he could claim the whole, as he did.

This the defense denies, claiming that the mother remained in full possession of her faculties, bright and of independent mind, interested in and fully capa-

ble of understanding and determining upon her business affairs as before, and that what she did or had done in relation to the same was but natural under the circumstances, of her own volition and according to her wishes. The parents and both sons, who apparently always lived in friendly relations with each other and had first knowledge of these matters, were all dead when this proceeding was begun, and the abundant testimony of neighbors and relatives as to surrounding circumstances, the relation between Phila and Franklin and what was said or done by them, was introduced by the respective sides for its bearing upon the issue as to undue influence.

Franklin had a home and family of his own and did not go to live on the old farm with his parents after Edwin's death, but that he frequently visited them, looked after their welfare and helped them in caring for their farm and domestic affairs after that time is clearly shown. They were in frequent and friendly communication back and forth between their homes and the old folks went to live with him during one winter; but returned to their old home where they remained until his mother died, after which he built a house on his place close by his own home for his father, who lived there the rest of his life, surviving his wife Phila two years and eight months and his son Franklin a year and five months.

In January, 1910, some two years before her death, Phila Sadler became ill, and experienced a partial paralysis on one side. Her sickness continued until April, but in the spring she was out again and in May went with her son Franklin to an old neighbor named Burnham, who had at times done business with and for her, with whom she had left certain bank certificates of deposit. These she asked for, indorsed and turned over to Franklin. Burnham testified that this occurred at his house some time before she and her

husband spent the winter with Frank; that he then noticed her right arm and hand were affected and it bothered her a little to write, that when he handed them to her she "made the remark that she was going to turn them over to Frank" and "handed them to Frank after she had indorsed them," that there were three or four of those certificates the amount of which witness did not remember, but the largest was $1,400 and the smallest "in the neighborhood of $150."

Franklin's widow testified that he brought the certificates of deposit to her in a cloth bag with some other papers and she put it in a box where they kept their deeds and other valuables, and from time to time he would take them to the bank and get new ones; that he also had some life insurance come due and put part of that in the bank, and after his death she found amongst his papers a certificate for $2,400. This is the most important item in relation to which claim is made. No certificate for that amount is shown to have been in existence when Franklin and his mother went to Burnham for her papers. One for that amount was first issued as deposited in their joint names on August 30, 1910. It was apparently renewed as it fell due, payable to the order of either or the survivor until after her death when it, or a certificate for that amount, was issued, December 29, 1912, payable to Franklin's order.

There is also evidence that Franklin had charge of other money matters of his mother's, how much and to what extent being more or less uncertain. The history of their banking matters for several years back was traced by the testimony of the bank officials and records, showing numerous deposits, interest credited, canceled certificates, etc., from which it was contended and is fairly shown that during the life of his mother Franklin renewed these certificates as they fell due or took new ones to their equivalent, or more,

made payable to himself or his mother or the survivor of them. Two certificates in their joint names, payable to either or the survivor were issued in April, 1910, apparently before she obtained those Burnham held. It is also indicated that Phila Sadler could and did transact business independent of Franklin after her sickness and subsequent to the time she indorsed and turned these certificates over to him. It was shown that in the banking line she and one Emma Brown made at least three deposits, the certificates for which were issued payable to the order of either of them, or the survivor. One dated September 26, 1911, for $450, payable to the order of either, was indorsed by Emma Brown and paid November 23, 1911.

In their verdict the jury found upon the items submitted that Franklin's estate was holden for the Abbott note and $98 cash claimed, but that the three certificates of deposit, for $2,400, $400 and $80, belonged to Franklin and no part of them was a just claim against his estate.

While the testimony introduced and the questions arising during the trial wander through a wider field of collateral inquiry, as is but natural and common in cases of this nature, the claimed errors brought before this court for review are directed and limited to refusal of the court to give various requests of plaintiff relating to the burden of proof where undue influence is at issue and the charge given upon that subject, as relating to the three certificates of deposit found by the jury to belong to Franklin, which it is claimed, and for this inquiry, may be conceded, represented the money and indorsed certificates of deposit turned over to him by his mother. There is no evidence that he ever asked or demanded or made direct effort to induce her to do this. The claim of undue influence is directed to inferences from sur-

rounding circumstances and the relations of the parties. Burnham's recollections as to the certificates he delivered to her was that Franklin figured them at that time as amounting to $2,006. The first shown of a $2,400 certificate was the one dated August 30, 1910, and made payable to either Phila or Franklin Sadler or the survivor, as were the others, after renewal. As they fell due the amounts were deposited in the name of Phila M. Sadler and Franklin Sadler, and certificates again issued payable to the order of either of them or the survivor. Of the significance of a deposit so made it was said by this court, in construing section 3 of Act No. 248, Pub. Acts 1909 (2 Comp. Laws 1915, § 8040):

"We are of opinion that in enacting the legislation in question it was the legislative intent not only to protect banks in the payment of deposits made in the manner indicated by the statute, but in the first instance, and in the absence of competent evidence to the contrary, to actually fix the ownership of the fund in the persons named as joint tenants, with the attendant right of survivorship therein." *In re Rehfeld's Estate*, 198 Mich. 249.

That these deposits were so made with Phila Sadler's knowledge and approval is evidenced by her identified signature indorsed with that of Franklin's on the canceled certificates up to the time of her death, and upon other canceled certificates of deposit for other amounts payable in like manner, not traced as connected with the three in controversy. As applied to these certificates the question of gift *inter vivos* debated in the briefs of counsel is unimportant, neither is it necessary to follow counsel's review of the testimony upon defendant's contention that there was no competent evidence to carry the case to the jury on the issue of undue influence, for the jury found in defendant's favor so far as these certificates are concerned.

The charge of the court was somewhat lengthy, explaining fully the nature of the case with appropriate instructions as to the respective claims of the parties and principles of law involved when undue influence is claimed, which was submitted to the jury as an issue of fact. Plaintiff's chief ground of complaint is that the court did not adequately charge that the burden of proof shifted to defendant when such fiduciary relations as existed in this case were shown, as asked in carefully prepared requests which were presented and refused. The court was tendered 24 requests by plaintiff, some 14 of which with more or less elaboration and variation are directed to the question of undue influence and shifting in burden of proof. The court apparently endeavored to cover the substance of the material portions of these requests in the charge with less stress and repetition. It would be of no profit to quote at length from or review in detail plaintiff's many requests, or all portions of the charge to which the assignments of error are directed, but the following excerpts from the charge indicate that the burden of proof where fiduciary relations appear, omission of which is most seriously complained of, was not overlooked:

"The question that you are concerned with in this case, and which you must decide, is the question of whether this was a gift by the mother to her son, and whether any undue influence or advantage was taken of the mother, Phila M. Sadler, by her son Franklin Sadler, in obtaining these certificates of deposit in their joint names, and afterwards getting the money on the same. * * *

"When I used the word 'fiduciary relation' I mean such a relation as exists between parent and child, where the child has the management of the parent's business and the parent looks to the son for advice and counsel, and the law calls that relation fiduciary, and the law is jealous and insists that there shall be no advantage taken because of that relation, and therefore looks with suspicion if that relation is used

for the benefit of the one who has charge of the business and gives counsel and advice.

"I charge you as a matter of law that if you find that Franklin Sadler, having charge of his mother's business, unduly influenced her to part with all this property to the detriment of the other heirs who had claims upon her bounty, to the party who held this fiduciary relation, and by the exercise of undue influence he obtains all this property for himself and the others obtain nothing, then I charge that is undue influence.

"In considering these claims of the various parties you have a right to take into consideration the law relative to transactions of this kind. Where a fiduciary relation existed between parties to the transaction, as between parent and child, the party who held this place of superiority and influence by virtue of the relation has the burden of proving the compliance of the transaction with the rules of equity and fair dealing, and to show that there was no undue influence."

The last quoted instruction was given to the jury three times. Twice on return of the jury for further instruction when the court asked if "some member of jury wants some part of the charge read," and the foreman replied, "With regards to undue influence on the whole case." When the jury was before the court for further instruction certain of its members propounded several questions, as to which there was some discussion in which counsel for plaintiff participated at times, offering suggestions to both the court and jury, and stating in answer to inquiry by jurors his recollection of certain parts of the evidence, on one occasion saying to a juror who asked as to the significance of certain facts counsel had stated, "The judge made that plain to you in reading the instructions." It is said in defendant's brief that this occurred in "the absence of the attorneys on the other side," which is not denied, and the record shows no participation by them in what took place. During this episode the following occurred, upon which plaintiff assigns error:

"*A Juror:* Could I put a question? I don't know as I could state it in a supposition case, but I will have to state it in this case. There was influence—we are agreed that there was influence with regard to this forty or eighty acres. Does that signify that there was influence used all the way through the case, or just in that instance?

"*The Court:* You don't have anything to do with the land proposition in your verdict. You could only consider that as bearing on the other question, and it would not of necessity mean that influence was used in the other case. In case you do find that influence was used in the deeding of the land, that would not of itself show that influence was used on the other matters. You would also have to find that influence was used as to the certificates of deposit and the notes."

The testimony as to the land transactions was introduced by plaintiff. It was a collateral matter admissible only for its bearing on the relations of the parties and inferable undue influence in connection with the certificates and notes which were in issue. The court again correctly told the jury, in substance, what the real issue was, and that in the verdict which they might render the land proposition was not the issue for them to decide, but they did have a right to consider the testimony in relation to it for its bearing upon the main issue, which was whether the certificates and notes were obtained by undue influence. In the connection given we discover no prejudicial error in this answer by the court to the juror's question.

Following further questions and answers between the court and jury, certain of the jurors, or a juror, more than once asked the court to read them his charge again and counsel for plaintiff said to the court at this point:

"I don't think it is clear with regard to the burden of proof as to undue influence. I think you ought to say something about that, on that point, where the burden of proof rests, whose duty it is to show undue influence."

To which the court replied:

"I think that instruction clearly specifies that: 'Where a fiduciary relation existed between the parties to the transaction, as between parent and child, the party who held this place of superiority and influence by virtue of the relation has the burden of proving the compliance of the transaction with the rules of equity and fair dealing, and to show that there was no undue influence.' "

The court then read to the jury much of the charge as previously given, including the portion last quoted. The record indicates that this case was thoroughly tried by counsel and submitted by the court to the jury under a carefully prepared charge, with full and impartial instructions as to the nature of the issue, the principles of law involved and the duty of the jury in weighing the testimony and deciding the facts within their province.

No reversible error is found and the action of the trial court will stand affirmed. The case is therefore remanded for such further appropriate proceedings as may be desired, in harmony with this opinion.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.