CONNOR *v.* HARRIS.

1. DEEDS—MENTAL COMPETENCE—FRAUD—UNDUE INFLUENCE—EVI-
DENCE—SUFFICIENCY.
   In suit to set aside conveyances of real estate on ground of men-
   tal incompetence on part of grantor, and fraud and undue
   influence on part of grantee, evidence *held,* sufficient to sus-
   tain decree in favor of plaintiffs.

2. PROPERTY—RIGHT TO DISPOSE OF.
   Persons mentally competent so to do, may, when free from
   fraud and undue influence, dispose of their property as they
   desire.

3. DEEDS—UNDUE INFLUENCE.
   Undue influence, to warrant setting aside conveyance, must be
   sufficient to overcome free agency of grantor and substitute
   will and intention of some one else in place of that of grantor.

4. SAME—BURDEN OF PROOF.
   In suit to set aside conveyances on ground of fraud and undue
   influence, grantee, who stood in fiduciary relation to grantor,
   and who obtained, without consideration, large amount of
   property from grantor, has burden of showing fairness and
   good faith of transactions.

Appeal from Wayne; Brown (William B.), J.,
presiding. Submitted April 6, 1932. (Docket No.
20, Calendar No. 36,321.) Decided June 6, 1932.
Rehearing denied September 14, 1932.

Bill by Richard P. Connor and others against
Mary L. Harris to set aside conveyances of interests
in real estate by Ellen R. Shipley and an agreement
between defendant and Ellen R. Shipley, deceased,
on ground of mental incompetence, fraud, and un-
due influence. Decree for plaintiffs. Defendant
appeals. Affirmed.

*Angell, Turner, Dyer & Meek,* for plaintiffs.

*Lucking, Van Auken & Sprague,* for defendant.

POTTER, J.   Plaintiffs filed a bill to set aside, on
the ground of mental incompetency, fraud, and un-
due influence, deeds by Ellen R. Shipley of real
estate in Wayne county, assignments by her of
vendor's interests in land contracts, and an agree-
ment given by defendant to deceased Ellen R. Ship-
ley in consideration therefor, an accounting, and
other relief.   From a decree for plaintiffs, defend-
ant appeals.

Plaintiffs Richard P. Connor and Frank Connor
are brothers of the deceased, Ellen R. Shipley.
Adele Connor is the wife of Richard P. Connor.
Marguerite Connor and Edwin Connor are daughter
and son of Frank Connor.   William Shipley was the
husband of Ellen R. Shipley, deceased; and defend-
ant, Mary L. Harris, is a sister of deceased, Ellen
R. Shipley.

Before her last illness Ellen R. Shipley was a
woman of good business ability, possessed of a sub-
stantial amount of property which she successfully
controlled and managed.   At the time of her death,
and for some time prior thereto, she had lived in
California.   In 1929 Ellen R. Shipley sold to Mary
L. Harris real estate in Macomb county for $30,000
and other real estate therein for $50,000.   Defend-
ant, Mary L. Harris, gave five promissory notes in
payment of the $50,000 piece of land; one to pay
toward a mortgage held by Smith-Burns Mortgage
Company on property in Breitmeyers Subdivision,
E., Belleview avenue, until the sum of $1,706 was
paid in full and discharged; another to pay toward
a mortgage of $2,625 held by the Grosse Pointe Sav-

ings Bank on property transferred by Ellen R. Shipley to Mary L. Harris; another to pay the balance of $17,055 on a land contract on real estate in the Dudley B. Woodbridge Subdivision; another to pay a mortgage of $18,000 held by the Wayne County Home Savings Bank on property in the city of Detroit. All these transactions are summarized in a statement signed by Mrs. Shipley and Mrs. Harris as follows:

| "Property purchased for | | $50,000 |
|---|---|---|
| Cash payment down | $1,000 | |
| Taxes due on property | 1,400 | |
| Grosse Pointe Bank | 2,625 | |
| Harry J. Phillips, Curtis Apts. | 17,055 | |
| Mtg. Wayne County Bank | 18,000 | |
| Smith Burns | 1,706 | 41,786 |

"Balance due        $8,214
        "ELLEN R. BISHOP SHIPLEY.
        "MARY L. HARRIS."

On account of deflation of prices, Mrs. Harris, the defendant, was hard pressed for money, and on February 2, 1930, wrote her sister Mrs. Shipley she could go no further in meeting her payments. Mrs. Shipley had not been well. In the latter part of 1929 she had a uterine cancer and entered the Hollywood hospital, was treated at different times, and finally entered the hospital, in the early part of 1930, on what proved to be her last illness. She grew progressively worse. She suffered from gastric disturbances, inability to eat, to retain food, loss of weight, emaciation, auto-intoxication, self-poisoning from the absorption of decaying tissues, lost strength, and was sometimes delirious. The cancer could not be removed; fistulas of the bladder developed; she was given codein, morphine, and the

Coffee-Humber treatment. On account of her toxic condition, she lay with her eyes shut, in a stupor; was not responsive to questions, and realized, as did defendant, it was only a short time before she would die.

Defendant knew her sister had a substantial amount of property; Mrs. Shipley did not want defendant to have her papers; but that was a thing of great interest to defendant, who had not been in California long before she got an order on Mr. Shipley to deliver to her the papers belonging to Mrs. Shipley. She had possession of these papers and knew the contents thereof, and Mr. Downing, the attorney who prepared the papers in dispute here, had prepared the will of Mrs. Shipley.

Up to the time defendant came to California, Mrs. Shipley was on excellent and affectionate terms with her husband, as well as with the other plaintiffs herein. This is shown not only by her conduct, but by her letters and by her last will and testament. Defendant had assumed heavy obligations. She owed Ellen R. Shipley considerable money. She was hard pressed for cash. She started operations immediately upon reaching California to get the property of deceased into her own hands. Ellen R. Shipley evidently had some suspicions of defendant's strength of character. Before defendant came there, Mrs. Shipley had her papers secreted in the garage where she lived. Soon after defendant reached California, she obtained an order on Mr. Shipley from deceased to deliver to her the papers belonging to deceased. At that time she obtained from Mr. Shipley a copy of the last will and testament of his wife. The defendant poisoned the mind of the deceased against her husband by telling her he was selling her personal furniture, until deceased

was, in the language of the nurse, "terribly upset," and complained that her husband was selling her personal furniture while she was on her deathbed. This was not true, but it indicates either Ellen R. Shipley labored under an hallucination or had been deceived or misled by some one telling her what was manifestly untrue. The defendant sought to prejudice Mrs. Shipley against the other plaintiffs. She told William Shipley, the husband of deceased, that Ellen had no business to give her property to her brother Frank because he had a bad wife. She complained that her sister Ellen had given some of her property to her brothers, claiming they could not take care of what they already had. When her brothers came to California prior to the death of Mrs. Shipley, Mrs. Harris was in apparent control of the situation in the hospital. She refused to let the husband, Mr. Shipley, visit his wife, and refused to let Mrs. Shipley's brother visit her except for short intervals and in her presence. When plaintiff Adele Connor and Mrs. Shipley were alone at one time for a short time and were attempting to talk, the defendant came in and told plaintiff Adele and her sister Ellen to "shut up," and in other ways she exercised a dominating influence and supervisory control over this weakened, helpless, and dying woman. Though defendant denies that as early as February 26, 1930, she knew her sister was dying, or that she talked with the attending physician about her sister's condition, her letter of that date to plaintiffs Richard P. Connor and Adele Connor shows she knew her sister was dying, that she had talked with the doctor, he held out no hopes of recovery, and it was just a matter of a few days when her sister would die. After they came to California some of plaintiffs learned some papers

had been procured, and asked defendant about them. She promised to show them the papers, but failed to do so, stating to the attending nurse she did not know what to tell them. The scrivener who drew the papers in question testifies, and he is corroborated by the subscribing witnesses in some particulars, that by arrangement with the attending physician no opiates were administered to Mrs. Shipley the day the papers in question were procured. He pictures Mrs. Shipley as bright, intelligent, acute, free from pain, cheerful, and unusually brilliant, while from the nurse, attending physician, and hospital records comes the proof which disputes these claims. The doctor denies the story of Downing that no opiates were to be administered or that he talked with him. The hospital records for the day show that Mrs. Shipley suffered from vomiting spells, and the doctor, instead of saying that she was bright and mentally competent, quick and intelligent, denies he even talked with Downing, and testifies Ellen R. Shipley was not on that day mentally competent to transact business. As pictured by all the testimony, Mrs. Shipley was in extreme pain, which was controlled and deadened by powerful opiates. Defendant knew she was dying, she had so written to the plaintiffs above mentioned. She had procured the administration of the last sacrament to her sister by a priest of the Catholic church. The attending physician says she was at that time growing progressively worse. When we consider the relationship between the parties, the condition of helplessness of Mrs. Shipley, and her dependence upon her sister, her weakened and dying condition, the anxiety of Mrs. Harris to get her property, the disposition that had been made of it by will prior to the arrival of Mrs. Harris in California, her dec-

larations she would have it fixed so Mr. Shipley would not get it, the necessitous circumstances of defendant, her avariciousness and desire to get control of the property of Mrs. Shipley, her constant surveillance of her in the hospital, the change wrought in the disposition of Mrs. Shipley's property, her statements to Mrs. Shipley that her husband, William, was selling her personal furniture while deceased was on her deathbed, her prejudicial statements to Mrs. Shipley against the plaintiffs, her exclusion of them from contact with Mrs. Shipley except in her presence, her position just outside the door when these conveyances were being procured by Downing, the execution of the papers in question in the absence of the attending physician, her refusal to state the contents of the papers to plaintiffs or to disclose their character, the terms of the papers themselves by which Mrs. Harris stripped her dying sister of all her property without consideration, in violation of the terms and conditions of her last will and testament, upon an agreement to pay her $300 a month for property concededly worth $100,000 and upwards, which $300 a month she did not pay and was morally sure she would never be called upon to pay because of her sister's dying condition, and the payment of $100 a month to Mr. Shipley, who on account of old age could not live long and who has since died, we agree with the trial court the transactions were so shocking to the sense of justice and fair dealing that the conveyances in question ought not to stand.

Persons mentally competent so to do, may, when free from fraud and undue influence, dispose of their property as they desire.

Undue influence, to warrant setting aside a conveyance, must be sufficient to overcome the free agency of the grantor and substitute the will and in-

tention of some one else in place of that of the grantor.

Fraud and undue influence are seldom capable of direct proof. They are generally proven and established as an inference from the facts and circumstances of the case.

In cases of fraud and undue influence, which is generally discussed as a branch of constructive fraud (Black on Rescission and Cancellation [2d Ed.] chap. 10), the court is not so much concerned with grantor's intention as with how that intention was produced. *Huguenin* v. *Baseley,* 14 Ves. Jr. 273, 300 (33 Eng. Repr. 526); *Duncombe* v. *Richards,* 46 Mich. 166, 171. That Mr. Downing suspected nothing wrong is not conclusive. *Duncombe* v. *Richards, supra; White* v. *White,* 89 Ill. 461; *Kastell* v. *Hillman,* 53 N. J. Eq. 49 (30 Atl. 535).

The grantor was peculiarly under the care, control, and domination of defendant, who stood in a fiduciary relation to her, and obtained, without consideration, a large amount of property from grantor. Under such circumstances the burden of proof is upon defendant, to show the fairness and good faith of the transaction. *Seeley* v. *Price,* 14 Mich. 541; *Witbeck* v. *Witbeck,* 25 Mich. 439; *Barnes* v. *Brown,* 32 Mich. 146; *Jacox* v. *Jacox,* 40 Mich. 473 (29 Am. Rep. 547); *Gates* v. *Cornett,* 72 Mich. 420, 434; *Sponable* v. *Hanson,* 87 Mich. 204; *Hemphill* v. *Holford,* 88 Mich. 293; *Smith* v. *Cuddy,* 96 Mich. 562; *Whiteley* v. *Whiteley,* 120 Mich. 30; *Noban* v. *Shoup,* 171 Mich. 191; *In re Sadler's Estate,* 201 Mich. 281; *Wagbo* v. *Smiseth,* 227 Mich. 313; *Bilman* v. *Kolarik,* 234 Mich. 689; *Cole* v. *Henning,* 237 Mich. 108; *Coy* v. *Doney,* 241 Mich. 308.

"In all the variety of the relations of life in which confidence is reposed and accepted, and dominion may be exercised by one person over an-

other, the court will interfere and relieve against contracts or conveyances when they would abstain from granting relief if no particular relation existed between the parties in which trust and confidence was reposed and accepted and there was not an opportunity for an abuse of the confidence and the exercise of undue influence.'' *Waddell, Admr.,* v. *Lanier,* 62 Ala. 347.

''Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases. The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief 'where influence is acquired and abused, or where confidence is reposed and betrayed.' '' 2 Pomeroy's Equity Jurisprudence (4th Ed.), § 951, p. 2026.

''Transactions of this nature are regarded by courts of equity with suspicion, and scrutinized with vigilance. The presumption is against the propriety of the transaction, and, as has been frequently said in our own cases, the duty of courts is to refuse judicial sanction to such an instrument until fully satisfied of the fairness of the transaction, and that the instrument is the intelligent act of the person executing it.'' *Smith* v. *Cuddy, supra,* 569.

In fact, ''The equitable rule is of universal application that where a person is not equal to protecting himself in the particular case, the court will protect him.'' *Connelly* v. *Fisher,* 3 Tenn. Ch. 382.

The statement of the general rule in *Allore* v. *Jewell,* 94 U. S. 506, was quoted with approval in *Bilman* v. *Kolarik, supra.*

"It may be stated as settled law that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside." *Allore* v. *Jewell, supra,* 511.

The trial court, we think, arrived at a correct conclusion.  Decree affirmed, with costs.

CLARK, C. J., and MCDONALD, SHARPE, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.