## SPRENGER *v.* SPRENGER.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—PARTIES.

In suit to set aside trust instrument and deeds executed by plaintiffs, an elderly bachelor and his sister, a spinster, in which defendant, their younger brother, was grantee, whether or not an attorney for defendant had misappropriated funds belonging to the family is not decided where such attorney has not been made a party to the suit.

---

Undue influence used in procurement of benefit, see Restatement, Restitution, § 70.

Fraud by fiduciaries, see Restatement, Restitution, § 8.

Grounds upon which a trust may be rescinded, see 2 Restatement, Trusts, § 333.

As to what constitutes a fiduciary relation, see 1 Restatement, Trusts, § 2, comment b.

2. SAME—CHANCERY CASES—REVIEW DE NOVO.

In hearing a chancery case *de novo*, it is the duty of the Supreme Court to weigh all the evidence and to reach a conclusion in accordance with the just rights of the parties.

3. SAME—REVIEW OF CHANCERY CASES.

In reviewing a chancery case the Supreme Court should not reverse the decree entered unless persuaded that it is not in accordance with the just rights of the parties.

4. DEEDS—FIDUCIARIES—BURDEN OF PROOF—EVIDENCE.

In suit by elderly bachelor and his sister, a spinster, both of whom were uneducated, inexperienced and ignorant about property matters, to set aside a trust instrument and deeds whereby defendant, a younger brother who stood in a fiduciary relationship by virtue of his handling of plaintiffs' property affairs for many years, without consideration procured the instrument conveying to him and his heirs the remainder interest in property valued at upwards of $400,000 to the exclusion of other presumptive heirs, decree dismissing the bill *held*, not justified by evidence, since defendant failed to sustain his burden of proving that plaintiffs fully understood the terms, import and effect of instruments executed and, if so understood, that no fraud or undue influence was exerted by himself to procure the instruments.

5. TRUSTS—TRANSACTION WITH GRANTOR—BURDEN OF PROOF OF FIDUCIARY—UNDUE INFLUENCE.

A fiduciary of the grantor who procures from latter a conveyance of latter's property has the burden of showing grantor understood the effect of the transaction and, if so, that no undue influence was exerted by the fiduciary.

6. SAME—TRANSACTIONS BETWEEN FIDUCIARY AND CESTUI QUE TRUST—PRESUMPTIONS.

Transactions between fiduciary and *cestui que trust* are regarded by courts of equity with suspicion and scrutinized with vigilance, the presumption being against their propriety.

7. SAME—EQUITY—SETTING ASIDE TRANSACTION OF FIDUCIARY WITH CESTUI QUE TRUST.

Plaintiffs who were demonstrably not equal to protecting themselves in transactions with their brother whereby without consideration he acquired control of their property and a conveyance to himself and heirs of the remainder interest *held*, entitled to have management agreement and conveyances set aside and decree for money withdrawn by defendant from accounts belonging to plaintiff.

BUSHNELL, BOYLES, and WIEST, JJ., dissenting.

Appeal from Macomb; Spier (James E.), J. Submitted April 16, 1941. (Docket No. 16, Calendar No. 41,301.) Decided September 2, 1941. Rehearing denied October 6, 1941.

Bill by Michael Sprenger and Elizabeth Sprenger against Leonard Sprenger and others to set aside a trust agreement and quitclaim deeds for fraud. Bill dismissed. Plaintiffs appeal. Reversed.

*Bruno L. Blinstrub,* for plaintiffs.

*Ernest Wunsch* and *Charles A. Retzlaff,* for defendants.

BUSHNELL, J. (*dissenting*). This is an appeal from a decree dismissing plaintiffs' bill of complaint which was filed to set aside a trust agreement and certain quitclaim deeds which appellants claim were fraudulently obtained from them by their brother, Leonard.

Plaintiff Michael Sprenger, when he testified on March 6, 1939, was a single man, 74 years of age, and still living on the farm in Warren township, Macomb county, where he was born. The other plaintiff, his sister, Elizabeth, 72 years old, likewise unmarried, also lived on the farm and kept house for Michael. Defendant Leonard Sprenger, plaintiffs' youngest brother, died after the trial at the age of 66. He lived in Grosse Pointe and left surviving him his wife, Mary, and four children, Leonard, Jr., Rose, Ralph, and Irma, who were also named codefendants. After the death of his father, Leonard, Jr., was substituted as a defendant in his capacity as administrator of his father's estate.

The properties involved in this litigation were inherited by plaintiffs from their parents and an uncle. Two other brothers and a sister at one time also had an interest therein. Plaintiffs' brother,

George Sprenger, who was declared an incompetent some years ago, died intestate in 1937, and his interest in the properties eventually passed to Michael, Elizabeth, and Leonard, when the five children of a deceased sister, Mary Sprenger Miller, released their interest therein. Michael also held an undivided interest in certain of the properties which he and a brother, John, who died in 1929, inherited from an uncle. These properties were largely farm acreage located close to the northeasterly section of the city of Detroit and were quite valuable, the assessed valuation of Michael's and Elizabeth's portion in 1938 being approximately $400,000.

The various Sprenger properties were not finally partitioned among the brothers and sisters and their heirs until 1938, although proceedings to accomplish this were begun by Mary Sprenger Miller's children in 1932. The trust agreement and various quitclaim deeds, which are the subject matter of this litigation, were executed by plaintiffs in 1938, after the partition had been consummated.

Ten years prior to the execution of these instruments, Edward F. Wunsch, a Detroit attorney, was retained by Leonard to represent him and other members of the family. Wunsch represented the Sprengers in a chancery suit in Macomb county, a lease involved therein, various condemnation proceedings, and many other matters.

One of the Sprenger properties is situated at the northeast corner of Gratiot and Eight-Mile road and is occupied by an amusement park. The State of Michigan in 1928 proposed taking some of the land for highway widening and agreed to pay $25,000 therefor. Considerable testimony was received concerning the disposition of this $25,000 received from the State. Deeds were executed and recorded in 1929 and a State warrant for $25,000

was delivered to Wunsch. John Sprenger died about this time and, a few days later, Wunsch deposited the warrant in a bank account, carried in his own name, in the city of Detroit under the following indorsement: "Michael Sprenger, John Sprenger, by Edward F. Wunsch, their attorney." This indorsement was followed by the signature, "Edward F. Wunsch." There is considerable dispute as to whether this money was borrowed by Wunsch from Michael and John or whether it was to be credited upon Wunsch's bill for legal services which, at that time, amounted to more than $10,000. The record shows that in January of 1935, Wunsch made a $1,000 payment to Michael, Elizabeth and Leonard on this so-called loan, the check being indorsed by Michael and Leonard alone. It is claimed by Wunsch that when this payment was made the Sprengers were indebted to him in the sum of $25,564.94. Michael and Elizabeth testified that they knew nothing about this loan arrangement until after the present litigation was begun.

Neither Michael nor Elizabeth had more than a fifth-grade education. Michael was characterized by the trial judge as a very quiet man, rather hard of hearing, and with failing eyesight, who, although trying to be fair and honest in answering questions to the best of his recollection, indicated an obvious desire to agree with counsel on both sides of the case. Elizabeth, on the other hand, was of an aggressive nature with very decided opinions, and of a determined character. She was evidently a dominating personality in the household, and Michael, in order to keep peace, carried out her desires in all matters. The trial judge said:

"Elizabeth's defiant attitude toward counsel, even in the simplest matters and questions, her rather childish conduct throughout the examination, and

silly giggling and mannerisms when making some remark she thought was cute, throws a cloud upon her mental capacity. Her obvious prejudice against the defendant Leonard and her inconsistencies cannot help but raise a doubt in the mind of one hearing her as to at least the reliability of her present recollection of the circumstances surrounding the execution of the instruments under attack."

Leonard was the businessman of the family, and the almost continual litigation since 1928, involving the Sprenger properties, required considerable work on his part to save them from tax sales and produce an income. When Leonard Sprenger left the homestead in 1928, he began to devote almost his entire time to looking after the Sprenger properties. In addition to seeing that the extensive litigation was successfully carried on, he also set about to pay up large amounts of back taxes and thus prevent loss of the properties by tax sales. The record indicates that more than $257,000 in taxes on the Sprenger properties had been paid by Leonard with money provided by him and other members of the family. The record shows that neither Michael nor Elizabeth had the education or capacity to carry on the complicated transactions necessary for the preservation of their properties. There is also evidence that for a good many years Leonard was left in complete charge of the properties and that Michael and Elizabeth continually expressed their desire that he take care of their interests. Michael for some time had been incapacitated with rheumatism and, near the close of the partition proceedings, both he and Elizabeth made it clear to Leonard that they wished him to "manage" the properties. From the record, it is evident that at least at that time Michael and Elizabeth felt that they were incapable of protecting their interests and they were

extremely anxious to be spared the trouble and disputes caused by continual litigation and the clash of conflicting interests within the family.

This situation resulted in the preparation of instruments by Wunsch, at the instruction of Leonard, which were designed to protect Michael and Elizabeth during their lifetime and provide for the disposition of their properties at their deaths. To this end, a trust agreement was drafted wherein Michael and Elizabeth expressed the desire to be relieved of the care and management of their property and yet retain the net income during their lives. The instrument conveyed the property listed therein to Leonard, his heirs and assigns forever, but in trust for Michael and Elizabeth, with the provision that, upon the death of the survivor, the properties were to go to Leonard and his heirs or assigns. It was further provided that, if Leonard should predecease the settlors, his four children were to be successor trustees.

Michael and Elizabeth executed wills in 1929 and again in 1938. In the wills executed June 25, 1929, they provided for bequests to their sister, Mary, of $100 and $1,000 to each of Mary's children. After several other minor bequests, the residue was divided by Michael, one-half to his sister, Elizabeth, and one-half to his brother, Leonard. Elizabeth, in the same manner, provided that the residue of her estate should go one-half to Michael and one-half to Leonard. Elizabeth, in an earlier 1929 will, had divided her estate three-eighths to Michael, three-eighths to Leonard, and one-quarter to Mary. Leonard's and Mary's shares were to go to their children in the event of their prior death. In wills executed on March 18, 1938, subsequent to the death of Mary, they made bequests of $200 to each of the children of Mary and divided the residue as in the

June, 1929, wills. All of these wills named Leonard and Wunsch as executors.

Plaintiffs' claims may be summarized as follows: They contend that a fraud was perpetrated upon them by their brother Leonard and Wunsch, first of all by the claimed misappropriation by Wunsch of the $25,000 received from the State in 1929. They claim that a note, executed by Wunsch, payable to Michael and John and Elizabeth, which was produced at the trial, had never been previously seen by them; that this loan had never been reported by Leonard and Wunsch to the administrator of John's estate, and they aver that the note was manufactured for the occasion in order to explain the misappropriation. Plaintiffs also claim that in 1937 they were induced to execute certain quitclaim deeds to parcels of their property under the fraudulent representation that they were for lots sold in certain subdivisions, and that, in any event, these conveyances were made without any valuable consideration moving to them. They say that they did not know they were executing a trust agreement in 1938 and did not understand the nature of the transaction. They insist that they believed they were signing a management agreement and that they were induced to execute the trust agreement and the quitclaim deeds in connection therewith by fraudulent misrepresentations, and without any knowledge or intention of depriving themselves of control over their properties. They claim that Leonard abused the confidence and trust placed in him by his aged and uneducated brother and sister, and that he conspired with Wunsch to draft papers that would benefit himself and his heirs. They say that neither the deeds nor the trust agreement were executed in accordance with statutory provisions in that the notary who acknowledged them was not present and

had no authority to acknowledge or witness the instruments.* They aver that they were induced to execute wills on the same day as a part of a plan to lull them into a sense of security by the representation that they were not parting with control of their property and that they could make subsequent disposition thereof. They further charge that it was the duty of Leonard and Wunsch to have some disinterested person advise them as to the nature of the instruments they were signing.

The trial judge permitted a wide latitude in the admission of testimony and, at various times, interrogated witnesses himself. He filed a comprehensive written opinion which occupies 25 pages of printed record. As is our duty in a trial *de novo,* we have examined all the testimony.

All that is necessary for us to say concerning the alleged misappropriation of $25,000 by Edward F. Wunsch is that his statement of charges for legal services performed for the Sprengers stands uncontradicted. Plaintiffs have failed to make any claim that his charges were excessive or that the services were not performed.

The deeds of 1937 become unimportant because of the legal effect of the trust instrument of 1938. The real question at issue is the validity of the 1938 trust instrument.

We are satisfied from our examination of the testimony that when plaintiffs executed the trust agreement they were fully aware of what they were doing. The terms of the instruments are in harmony with their actions and conduct during preceding years. The wills executed June 25, 1929, show intentions consistent with the disposition of their

---

* See 3 Comp. Laws 1929, § 13284, as amended by Act No. 162, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 13284, Stat. Ann. 1940 Cum. Supp. § 26.527).—Reporter.

property as made in 1938. The trust agreement was not hastily executed but only after considerable discussion and only after the corrections requested by plaintiffs had been made. It is clear that Leonard Sprenger and Edward F. Wunsch were largely responsible for the preservation of the Sprenger properties. These and other circumstances indicate that plaintiffs fully understood the effect of the instruments, and that they were not obtained by mistake, fraud, duress, or undue influence.

With regard to plaintiffs' claim of formal defects in the execution of the 1938 instruments, we said in *Kerschensteiner* v. *Northern Michigan Land Co.,* 244 Mich. 403, 417:

"Deeds of real estate, to be entitled to record, must be acknowledged, but an acknowledgment is not a part of the conveyance. *Brown* v. *McCormick,* 28 Mich. 215, 219; *Livingston* v. *Jones,* Harr. Ch. (Mich.) 165. Title to real estate may be transferred by conveyances not acknowledged. *Price* v. *Haynes,* 37 Mich. 487. Deeds in order to be recorded should be witnessed, but a deed not witnessed is good between the parties."

Plaintiffs rely on *Connor* v. *Harris,* 258 Mich. 670. The rules stated in the *Connor Case* are applicable, but the facts are distinguishable from the instant case.

"In considering an equity case *de novo,* we are much impressed with the decision of a trial judge on a question of fact when he had the advantage of seeing and hearing the witnesses. This is particularly true when his conclusions are supported by credible testimony." *Fenwick* v. *Leonard,* 255 Mich. 85, 90.

The decree dismissing plaintiffs' bill of complaint should be affirmed, with costs to appellees.

BOYLES and WIEST, JJ., concurred with BUSHNELL, J.

CHANDLER, J. I am unable to join in the opinion of Justice BUSHNELL affirming the decree entered by the trial court in this cause. Such decree should be reversed and one entered granting the relief sought by plaintiffs in their bill of complaint.

The record is conclusive that plaintiffs at the time of the execution of the trust agreement had the utmost confidence in the integrity of their brother Leonard, defendant herein, and that, for upwards of 10 years prior to the acts herein complained of, the relationship of their brother to them was clearly a fiduciary one. He had the management of their property which consisted largely of real estate and was with his attorney, Edward F. Wunsch, directing and handling the almost endless litigation in which this family was involved. The employment of Mr. Wunsch was by Leonard to represent himself, plaintiffs and two other brothers, now deceased, whose interests in most instances were identical with that of plaintiffs and defendant. It must, therefore, be said that the relationship of Mr. Wunsch towards plaintiffs was also of a fiduciary character.

The trial judge seemed to be somewhat in doubt as to the mental capacity of plaintiff Elizabeth. A careful review of the entire record should leave a doubt in no one's mind. It is most convincing that she is and was mentally incompetent to enter intelligently into any transaction tending to a disposition or conservation of her property without independent advice from a disinterested party. A similar review of the record fails to disclose a much higher degree of mental competency on the part of plaintiff Michael. If credit is to be given to the testimony of Leonard and Attorney Wunsch, Michael should have been under guardianship as far back as 1929.

An incident which undoubtedly had something to do with the transaction by which defendant secured

the conveyances to himself of all of plaintiffs' real estate in February, 1937, and later in March, 1938, the execution of the trust agreement involved herein, which is not referred to in Justice BUSHNELL's opinion, was a confidence game that was perpetrated upon plaintiffs by two strangers, either late in December, 1936, or in January, 1937. This can best be described by quotations from the testimony of plaintiffs on cross-examination upon the hearing of this cause. We quote from Michael's testimony:

"Did you go to the Warren Bank in 1937 any time or just before that and draw out $2,000?

"*A.* Yes, I did get $2,000.

"*Q.* What was that? Will you explain that to the court just what happened at that time?

"*A.* I tell you, that time— * * *

"*Q.* I am quite anxious you get our picture. Just tell him.

"*A.* I got fooled out of that.

"*Q.* Tell us what happened, the whole story, so that the Judge will get the picture.

"*A.* They come in and sat down and got talking and said if I would put in so much money they would double it.

"*Q.* Who was that?

"*A.* I don't know, strangers.

"*Q.* Two strangers come in and told you they would double it. Then what happened?

"*A.* I was foolish enough to put in the money and lost it.

"*Q.* You went to the bank and drew $2,000. Did Elizabeth draw some more of your money and put it in?

"*A.* She didn't get it out of that bank.

"*Q.* She got it out of a bank in Detroit?

"*A.* Yes.

"*Q.* What she really did, she went to Leonard Sprenger and got the bank books, your bank books?

"*A.* Yes.

"*Q.* And went to the bank and got this money and did she take this money and give it to the same people you give the $2,000 to?

"*A.* Same people.

"*Q.* Do you know how much it was all together?

"*A.* $8,000. Some fellows influenced us and got the money.

"*Q.* They were two people you don't know their names?

"*A.* No.

"*Q.* They came over there—you stop me if I am wrong, I don't want to misrepresent—they got the $2,000 from you out of the Warren Bank and at the same time Elizabeth went down and got the bank book and drew out $6,000 more, that was $8,000 altogether, and you and she gave them to these two men. Were they supposed to put it in some paper and was supposed to be doubled?

"*A.* Well, give them so much and they would double it. Instead of getting $2,000 out of it we would get $4,000; would be doubled, and when we come to look at what they give us it was nothing but old newspaper.

"*Q.* In other words, it was like the old gold brick game, they were going to take this $8,000 and put it in some paper, whatever they did, some kind of magic, and they were going to take out $16,000 and give it to you?

"*A.* Yes, that is the way.

"*Q.* And you put the $8,000 in and the men disappeared and the $8,000 disappeared and when you opened the package it was just old newspaper?

"*A.* Yes, that is the way they catched us.

"*Q.* They got away with the $8,000? Let's try to fix a time on that. This lawsuit was finished 1938,

that was about a year before that, beginning of 1937 or end of 1936?

"*A.* About two years ago now.

"*Q.* About the beginning of 1937?

"*A.* Yes.

"*Q.* Wasn't that the first thing after that you wanted to tie this stuff up in some way so that someone wouldn't come in there and get it away from you? Isn't that what you had in mind? Weren't you afraid someone else would come in and do the same thing?

"*A.* I look out, get catched once is enough.

"*Q.* Isn't that the first time you started talking about protecting yourself in some way that some smart fellow wouldn't come in and take your property?

"*A.* I had it on my mind but I didn't do anything about it.

"*Q.* That was on your mind until February, 1938, when this litigation with the Millers got out of the way and within a month of that is when these deeds and this trust agreement was made to Len?

"*A.* I guess that is right."

Elizabeth's testimony relative to the incident follows:

"*Q.* Do you owe Mike Sprenger a lot of money for taxes?

"*A.* Does that hurt you?

"*Q.* I submit I am entitled to an answer and I ask the court to instruct her to answer.

"*A.* I am always home working with my brother. Where in God would I get the money?

"I lent my brother $2,000 and I said, 'Mike, you got to take me in with you.' It is my brother and he has got nothing to say. Me and Mike work together and lives together and always work together. It is none of his business.

"*Q.* I still submit I am entitled to an answer.

"*The Court:* Read the question. (Pending question read by reporter.)

"*Q.* Yes or no, witness.

"*A.* Who told you that.

"*Q.* The Judge told you to answer the question.

"*A.* Mister, I and the boys work together and I give him $2,000 and I told him—

"*Q.* I ask that be stricken. If the witness would spend half of the energy we would get along lot quicker. We can go into that.

"*A.* Me and Mike went together and agreed together and worked together all our life.

"*The Court:* Just answer the question. Your lawyer will bring out all the explanations there are. They are entitled to have an answer. You make it appear there is something wrong about it when you don't want to answer. I don't suppose there is. Why don't you answer the question?

"*A.* Me and Mike always lived together and I think he should pay any taxes.

"*The Court:* What is wrong with answering the question? Go ahead and answer the question. Just takes a yes or no answer.

"*A.* I don't know.

"*Q.* Isn't it a fact you owe him over $24,000 in taxes he has paid on your property?

"*A.* Who was telling you that? That big mouth right there?

"*Q.* I am asking you a question, witness.

"*A.* I am working at home. What the matter with you?

"*Q.* I ask that be stricken.

"*A.* When you working with your brother—I earn my time to home.

"*The Court:* Repeat the question.

"*Q.* I would like an answer to my question. The record ought to show this—

"*The Court:* I think the record shows the attitude of the witness. (Pending question read by re-

porter.) You can answer that yes or no or you don't know.

"*A.* Well, I don't know, you know.

"In 1936 I and Mike Sprenger made an investment with some men that was going to double our money, but I didn't take the $35,000 anyhow. I didn't beat us out of Uncle Pete's estate. I did not know this man we gave this money to very long. He come sometimes, we didn't know him much. Maybe he said his name. I don't know his name. He said his name. I am going to ask you one question, it is my money. That is my business where he lives. I worked with Mike and we worked together. I can get my bankbook and show it to you. I will get it when I come back. I can show you my bankbook.

"*Mr. Blinstrub:* I object to this, has nothing to do with the trust agreement whatever. * * *

"*The Court:* He may go into that. That is the same one you went into with Mike.

"*Q.* Yes, same one. I just want to see what part this witness played in that particular transaction. Mike, I think, told us just about what happened. I want to know what this witness claims about it. Were you sitting here and listening to what Mike testified happened on this particular deal? Did you hear Mike testify, witness? I think your Honor, I ought to get a couple answers from this witness. I didn't get any, I will concede, but I think I ought to get a few.

"*The Court:* You understand the questions?

"*A.* That is all right, it wasn't his. Nobody but me and Mike's money. He said I took Mike's money. I am going to get my bankbook and show him whose money it is.

"*The Court:* He is not asking you that now.

"*A.* I will show him. He got his big mouth open.

"*Q.* You will get that chance now, I want you to open yours and answer a question. (Pending question read by reporter.)

"*A.* I think I—he came from Oklahoma.

"*Q.* Just tell the judge the whole story.

"*A.* An oil man.

"*Q.* Just tell so that the judge gets the whole story.

"*A.* It was my money. Who told you that?

"*The Court:* Go ahead. It was your money. What happened?

"*A.* Fellow come, oil man, and we thought we was going to make money and we didn't.

"*Q.* How were you going to make the money? What was the deal? He was going to wrap your $8,000 in a piece of newspaper, wasn't he?

"*A.* Not me.

·"*Q.* This man was going to wrap it up in a piece of newspaper?

"*A.* I didn't have none in my hand.

"*Q.* And then this man took the $8,000 and laid the newspaper away?

"*A.* I didn't give the $8,000.

"*Q.* Did he get the $8,000 or didn't he?

"*A.* Yes, but I didn't give it.

"*Q.* Then Mike gave it. I don't care who did, but you were there.

"*A.* I took some too.

"*Q.* Am I right in saying he took the $8,000 and put it in a piece of newspaper and laid it away and then you were supposed to get the newspaper down and open it up and there was supposed to be $16,000 there? Isn't that the deal he made? Isn't that right—and when you opened the newspaper there was nothing in it but some cut newspaper? That is the fact, isn't it? I guess I am testifying, Judge. I am trying to get a record some way.

"*The Court:* Is that right or isn't it, that statement?

"*A.* He doesn't know nothing of it.

"*The Court:* Was his statement right or wasn't it? I don't know. I don't know whether he has stated it right or not.

"*A.* He has got it wrong. He said wrapped in a piece of newspaper but he has got that wrong.

"*Q.* You tell it the right way. I want it in the record the way it belongs.

"*A.* Whose money was it?

"*Q.* I don't care whose money it was. You tell what happened.

"*A.* You got nothing to say. If I give my money away, if I am at fault, I am at fault, but I didn't take $25,000 and didn't beat out of Uncle Pete's estate, and somebody beat us out of Uncle Pete's estate.

"*Q.* I ask that be stricken. I think if we can I am entitled to something. Don't you want the judge to know the truth about this whole deal?      .

"*A.* What?

"*Q.* Don't you want the judge to know what happened?

"*A.* Some day I get it back.

"*Q.* Don't you want the judge to know what happened?

"*A.* If it was my money, if it was somebody else's money, I have to tell the truth, but it was my money.

"*Q.* You are asking this judge to protect you and I am trying to find out whether you need protection so that this judge knows what he has to do to protect you. You tell us what happened on that deal. Don't you want to tell?

"*A.* You will never find it out until I see him I got it back. You will open your mouth, then I will give it to you.

"*Q.* Do you know the man's name?

"*A.* I heard his name.

"*Q.* What is his name?

"*A.* Must I tell you everything?

"*Q.* Yes, I think I am entitled to ask you anything.

"*A.* If you find out, you die on your head, you step on your head, I wouldn't tell you.

"*Q.* Where does the man live?

"*A.* He live with his sister.

"*Q.*    Where?

"*A.*    Thats is all I tell you, don't tell you any further.

"*Q.*    Have you seen him since 1936?   Have you seen this man since that day you made this deal?

"*The Court:* Just answer, witness.

"*Q.*    Your Honor, it is almost 4:30 now, I wonder if it wouldn't be best to instruct this witness if she wants to refresh her memory—

"*A.*    You said it was in paper but it was not in paper.

"*Q.*    What was it? I wasn't there, I am trying to find out from you.   What did he wrap it in?   Was it a sack or what was it?

"*A.*    In a silk handkerchief, white, now, you know it.   Now you got the answer.

"*Q.*    He took the $8,000—

"*A.*    I didn't take the eight."

Considering the testimony of Michael above quoted and the other testimony given by him, as disclosed by the record, makes readily understandable what prompted the following statement found in the trial court's opinion:

"Plaintiff Michael Sprenger's appearance on the stand presented an interesting problem.   Michael made a very quiet witness, rather hard of hearing and eyesight failing slightly, but gave every appearance in the answering of questions of trying to be fair and honest and give the best of his recollection.   The outstanding weakness of his testimony, however, is his obvious desire to agree with the questioning counsel regardless which side counsel was on.   He rather presented the picture of what is called in common parlance a 'yes man,' undoubtedly due to his advanced years and desire to avoid argument.   He presents a most likely field for 'undue influence' at the present time, and a tempting victim at the hands of the unscrupulous."

Michael was indeed an easy and tempting victim. It would require no urging, no coercion, no promises, no misrepresentations on the part of his brother and attorney to secure from him the execution of any instrument they desired, or his consent to any action they proposed. Elizabeth might present a more difficult problem, but a review of her [testimony] and other testimony in the record discloses that she would readily go along with Michael in any action he might see fit to take. When her brother succumbed to the wiles of the confidence men, she said "Mike, you got to take me in with you." As further showing her desire and disposition to do whatever Mike was willing to do, attention is directed to the testimony of defendant relative to the execution of the trust agreement on March 16, 1938, wherein he said that when Mr. Wunsch asked Michael who he wanted to take care of his property, and he replied, "My brother Leonard," that Elizabeth said, "He can take care of mine, too."

Justice BUSHNELL in his opinion gives a summary of the claims of plaintiffs. We find that the record sustains the claims of plaintiffs as summarized by Justice BUSHNELL in respect to all matters that are material to the issue involved in this appeal. We do not feel that the question of the misappropriation of funds by Attorney Wunsch, or the question as to whether a loan was made by plaintiff Michael and his brother John to Mr. Wunsch is highly important to this issue except as bearing upon the credibility of the testimony of Mr. Wunsch and defendant. Suffice to say that even if the claims of Mr. Wunsch and Leonard are true as to the circumstances involving the $25,000 fund received by Wunsch, this transaction does not redound to the credit of either. Mr. Wunsch is not a party to this

litigation and we find it unnecessary to discuss this phase of the case further.

The testimony of plaintiffs that they did not knowingly execute quitclaim deeds to defendant in 1937 for the purpose of placing title to the real estate in Leonard, and that they did not execute the trust agreement knowing and understanding that the title to their property upon the death of the survivor should go to Leonard, if he survived, or his children, in case he predeceased plaintiffs, is most convincing. That it was given solely for the purpose of placing the management and control of their real estate in Leonard for the purpose of protecting title to their property from conniving outsiders is also most convincing, and their testimony to this effect finds support in certain testimony given by Leonard, which we quote here:

"*Q.* Do you understand that after you recorded the quitclaim deeds you had title to the property?
"*A.* *Well, title to protect the property.*
"*Q.* *Title to protect their property?*
"*A.* *Yes.*
"*Q.* *Protect them in what way?*
"*A.* *That they couldn't go to work and sign it over to somebody, somebody couldn't come in and take it away, outsider.*
"*Q.* So that the purpose of these deeds and declaration of trust was to protect their interest in the property?
"*A.* Yes, as long as they lived.
"*Q.* And that was the gist of the conversation at the time they signed it, was that correct?
"*A.* The conversation you mean?
"*Q.* Yes.
"*A.* We talked that over at that time.
"*Q.* That is what you talked about on March 16, 1938, that is the way you talked about it?

"*A.* That is the way we told them about it, yes.

"*Q.* You talked to Michael about it?

"*A.* Michael.

"*Q.* You talked to Elizabeth too?

"*A.* They were right there both at that time when they signed.

"*Q.* And they told you they wanted you to protect them?

"*A.* Well, said to protect them.

"*Q.* You wanted to protect their property?

"*A.* Yes.

"*Q.* What else was said as far as Elizabeth was concerned? She refused to sign that?

"*A.* No—the first time.

"*Q.* What did she say the first time when she refused to sign it.

"*A.* I don't just remember.

"*Q.* Do you remember what she told you?

"*A.* No, I do not.

"*Q.* Did you say anything to her?

"*A.* No, I didn't say much to her.

"*Q.* Did you say very much to Michael?

"*A.* No, Mike never said a word, he never said nothing.

"*Q.* Never said nothing?

"*A.* No, sir.

"*Q.* Did Elizabeth do much of the talking?

"*A.* She done the talking. Mike sat there and didn't say a word only the time Mr. Wunsch asked him.

"*Q.* What did he ask him?

"*A.* Asked him who he wanted to take care of his property?

"*Q.* What did he say?

"*A.* His brother Leonard.

"*Q.* Your sister, Elizabeth, what did she say?

"*A.* She said 'He can take care of mine too.'

"*Q.* Is that all that was said?

"*A.* Didn't say nothing more.

"*Q.* Didn't say anything more?

"*A.* No.

"*Q.* You are quite positive Mike didn't say a word hardly?

"*A.* Didn't say a word. Mike always said, 'Take care of my money and property,' always said it.

"*Q.* You said Elizabeth didn't say very much but she done most of the talking.

"*A.* She done most of the talking.

"*Q.* Mike just sat there and you asked him to sign it?

"*A.* Mr. Wunsch showed him the papers and asked him to read it.

"*Q.* Did he read the deeds?

"*A.* He read them.

"*Q.* Did Mike read them?

"*A.* He didn't pay much attention.

"*Q.* Did he read them?

"*A.* He looked them over—I don't know.

"*Q.* You were there?

"*A.* Yes.

"*Q.* Did he read them?

"*A.* I don't know whether he read them. He looked at them.

"*Q.* Did Elizabeth read them?

"*A.* She looked over the deeds, yes.

"*Q.* Did you read them for them?

"*A.* No, I didn't.

"*Q.* Did you tell Elizabeth—you heard what Elizabeth said, 'If you don't sign you see what you get'?

"*A.* Yes, but I don't remember saying that.

"*Q.* You might have said it?

"*A.* I don't remember it.

"*Q.* Is there a possibility you might have said it but you forgot?

"*A.* I just don't, don't remember saying it.

"*Q.* You don't remember whether you said it or not?

"*A.* No.

"*Q.* Of course, Mr. Kodweiss wasn't there?

"*A.* No, he wasn't there.

"*Q.* Now, when these deeds were made out in 1937 you were alone when the deeds were signed, were you?

"*A.* You mean which—the first two deeds?

"*Q.* Yes, two first deeds?

"*A.* No, me and my daughter.

"*Q.* Mr. Wunsch wasn't there?

"*A.* No.

"*Q.* He appears to be a witness on the deeds but he wasn't there at the time?

"*A.* He wasn't there at that time.

"*Q.* Why didn't you also get deeds to the Eight-Mile Road piece and Duflo piece and the farm at that time?

"*A.* I wanted to save that because she lost that money. I was scared somebody would go in and she would deed it all. I said they would have two pieces left and always have some money left."

Mr. Justice BUSHNELL in his opinion says:

"The terms of the instruments [meaning the deeds and trust agreement] are in harmony with their [plaintiffs'] actions and conduct during preceding years. The wills executed June 25, 1929, show intentions consistent with the disposition of their property as made in 1938."

This we find to be correct. In 1929 the plaintiffs and their brothers were in litigation with their sister Mary Miller, which engendered much ill feeling towards Mrs. Miller and her family. Recently Mary's children and these plaintiffs have become reconciled. Furthermore the record shows that both plaintiffs were familiar with wills and understood that they were revocable and could be changed at will.

Some time in 1930 the sister Mary died leaving five children, whose relationship is the same as that of Leonard's four children, and these children of

Mary and Leonard are now the presumptive heirs at law of these plaintiffs, and it is their desire, as expressed by wills made in 1938, that these children shall, at their death, share equally in their estates. The record shows that at the time of the hearing of this cause in the court below, wills executed by plaintiffs were in existence by which Leonard was bequeathed one-half of their estates, and that in case he predeceased them or the survivor, it should go to his children, and one-half was bequeathed to the children of Mary. All of these children are the natural objects of the bounty of these plaintiffs, and it is their expressed desire that said children shall, at the demise of the survivor, share equally in their estates. This is not an instance of a change of mind and attorneys by plaintiffs after having entered into an agreement, as was the case in *Sherman* v. *Phelps,* 297 Mich. 153. There the plaintiff had the benefit of advice of counsel of her own choosing and who participated in the drafting of the agreement which she attempted to repudiate. Here we have an instance where the plaintiffs were under the care, control and domination of a brother who stood in a fiduciary relationship to them and who, with his attorney, who had also been attorney for plaintiffs, and whose relationship towards plaintiffs was also fiduciary in character, obtained from these plaintiffs without any consideration whatsoever therefor property appraised at $400,000. These plaintiffs did not have the benefit and advice of counsel of their choosing, nor of any one competent to determine the effect of these instruments.

Before discussing the legal principles applicable to this situation we desire to call attention to certain facts appearing in the record to which no reference has been made in the opinion of Justice BUSHNELL, nor was reference made thereto by the

trial judge in his opinion, which we think most significant as bearing upon the good faith and integrity of defendant in his dealings with his elderly and confiding brother and sister, and also as bearing upon the credit that should be accorded his testimony, and the reliability that should be placed in him by the court. It is to be noted that the trust agreement by which Leonard controls, and eventually expects to receive title to plaintiffs' property, is only applicable to the real estate in such agreement described. It is further noted that the bank accounts of the plaintiffs were in the names of Michael, Elizabeth and Leonard, or the survivor. It was admitted by defendant in his testimony that these deposits in numerous banks were the money of Michael and Elizabeth, and that he had no interest therein. On the day the summons in this suit was served on defendant, October 6, 1938, the defendant Leonard withdrew from four banks in the city of Detroit, where plaintiffs had deposits amounting to several thousand dollars, all of these funds, and made a redeposit of the same, not in his own name nor in his name as trustee, but in the name of himself and his son payable to the survivor. He did this notwithstanding the fact that at that time an injunction issued out of the circuit court for the county of Macomb in chancery had been served upon him enjoining him from withdrawing any of plaintiffs' funds from the banks, and so far as the record discloses, these moneys to the extent of several thousand dollars are still on deposit in the name of Leonard and his son, or the survivor. This to our mind clearly indicates that the confidence and trust that was reposed in Leonard by these plaintiffs was not only misplaced but has been most grossly abused, and leads to the unalterable conclusion that it was the intention of Leonard,

during the entire period of his management of the affairs of these plaintiffs, to appropriate, either by fair means or foul, to himself and family, the entire assets of plaintiffs. Leonard makes no excuse or explanation for this act other than he did not understand the terms of the injunction served upon him until after he had seen his attorney, which was subsequent to the withdrawal of practically all of plaintiffs' funds from the various banks.

Defendant and his attorney in this case were dealing with two uneducated, inexperienced and ignorant people. The plaintiff Elizabeth's experience during practically all of her lifetime had been that of a housekeeper for three bachelor brothers, one of whom, George, was demented and had been for many years prior to his death in 1937, and whose condition was such as to require almost constant care and attention. She had never lived in any place other than the house in which she was born, and never had known or experienced anything but hard labor. Michael's experience was as limited as his sister's. He had during his entire lifetime worked the farm upon which he was born and raised, and these people, confiding in the fairness and integrity of their brother Leonard, had been content to permit him to manage and control their affairs. The signing of deeds was not an unusual experience for them because many lots had been sold from subdivisions in which plaintiffs had an interest and whenever deeds were placed before them for execution, they unhesitatingly signed them upon the request of their brother. This situation lends credence to the claim of appellants that the defendant and his attorney secured the execution by plaintiffs of wills in addition to what plaintiffs thought was a management agreement, leading plaintiffs to believe that they were not parting with the title to their prop-

erty and could make subsequent disposition of same by will at any time.

We hear chancery cases *de novo;* it is therefore our duty to weigh all the evidence, and to reach a conclusion in accordance with the just rights of the parties after a review of the entire record, *Petz* v. *Gaines,* 286 Mich. 450; *Hawthorne* v. *Dunn,* 210 Mich. 176; and we should not reverse the decree entered here unless we are persuaded that it is not in accordance with the just rights of the parties.

In the instant case, after a careful review of the entire record, we are persuaded that the decree entered herein is not sustained by the evidence, and is not in accordance with the just rights of the parties.

We can express our views in a no more apt or briefer way than by paraphrasing from the case of *Smith* v. *Cuddy,* 96 Mich. 562, 568, 569, because the facts in that case and the legal questions involved are almost identical with those in the case at bar. Under the circumstances of this case, the burden was upon the defendant to show not only that plaintiffs fully understood the terms, import and effect of the instruments executed, but, if their intent was as expressed by those instruments, to show that such intention was not produced by undue influence exerted by himself. Defendant's testimony fails to satisfy us upon either point. Transactions of this nature are regarded by courts of equity with suspicion and scrutinized with vigilance. The presumption is against the propriety of the transaction, and, as has been frequently said in our own cases, the duty of the courts is to refuse judicial sanction to such instruments until fully satisfied of the fairness of the transaction, and that the instruments are the intelligent act of the persons executing them.

The testimony in the instant case falls far short of satisfying us of the fairness of the transaction by which this defendant, without consideration, secured from plaintiffs for himself and his family title to real estate of great value and that the instruments complained of were the intelligent acts of these plaintiffs.

We quote from the opinion of Justice McGRATH in *Smith* v. *Cuddy, supra:*

"In *Jacox* v. *Jacox* (40 Mich. 473 [29 Am. Rep. 547]), Mr. Justice GRAVES says:

" 'The actual conduct of relatives and others at the time in question towards the individual is generally of much greater value as proof of their conception of his mind or capacity than any term they may employ on the stand to express it.'

"In the present case, the best evidence of the incapacity of the complainant in matters of business was the almost absolute control which defendant assumed and exercised over her business affairs. Continuing, Mr. Justice GRAVES says:

" 'In case it appears from the facts that there was mental disorder, but not of a high degree or far advanced, it then becomes material to inquire into the nature of the transaction, and the influences leading to it; and if the circumstances disclose that the person under the infirmity, whether through choice, accident, or otherwise, was as matter of fact for the time being in the place of ward of the other party, or was by his own consent, however brought about, in a state of submission to the judgment or opinion of the other, a presumption will arise adverse to the justice and equity of the bargain, and the bargainee will be required to show that no advantage was taken, and that in itself the arrangement was not only suitable, fair, and conscientious, but one expedient under the circumstances, and conducive to the interests of the other.'

"The decree below must therefore be reversed, and a decree entered here for complainant, ordering a reconveyance, the decree to stand in lieu of such reconveyance until the same is made."

We call attention to *Beattie* v. *Bower,* 290 Mich. 517, and particularly to the authorities cited therein, as supporting the conclusion reached by us in this case. See, also, 2 Pomeroy's Equity Jurisprudence (4th Ed.), § 951, p. 2026; 10 R.C.L. p. 327; 21 C.J. p. 111; *Richardson* v. *Richardson,* 266 Mich. 194; *McGraw* v. *Muma,* 164 Mich. 117.

"In all the variety of the relations of life, in which confidence is reposed and accepted, and dominion may be exercised by one person over another, the court will interfere and relieve against contracts or conveyances, when they would abstain from granting relief, if no particular relation existed between the parties, in which trust and confidence was reposed and accepted, and there was not an opportunity for an abuse of the confidence and the exercise of undue influence." *Waddell* v. *Lanier,* 62 Ala. 347.

"The equitable rule is of universal application that where a person is not equal to protecting himself in the particular case, the court will protect him." *Connelly* v. *Fisher,* 3 Tenn. Ch. 382.

The trial court in effect found that these plaintiffs needed protection. After quoting from *Waddell* v. *Lanier, Smith* v. *Cuddy,* and *Connelly* v. *Fisher, supra,* the court said:

"This court wishes it had the power to enforce the equitable rule just quoted, that where a person is not equal to protecting himself in the particular case, the court will protect him.

"Michael Sprenger needs protection. He is not equal to protecting himself. He needs protection against his sister, Elizabeth, leading him into un-

sound investments and transfers. He needs protection against the Miller children and Norman Rice and Bruno Blinstrub, who have been the source of so much trouble and litigation against him, and he now needs protection against his brother Leonard and Leonard's attorney, Edward F. Wunsch, who now for the first time [has] been thrown into opposition against Michael's present desires, and probably his best interests."

If any attempts are made on the part of relatives or outsiders to take advantage of the condition of these plaintiffs, it occurs to us that there should be at least one of the next of kin or a friend that would invoke the aid of a court having jurisdiction to protect these plaintiffs against any designing relatives or outsiders.

We reach the conclusion in this case that the management agreement must be set aside, as well as the conveyances made by plaintiffs to defendant Leonard, in the bill of complaint described, and that, if Leonard has not already done so, his estate should be required to account to plaintiffs for the moneys withdrawn by Leonard from bank accounts belonging to plaintiffs on October 6, 1938, or any other time.

The decree entered in the court below is reversed and one may be entered in accordance with this opinion.

Plaintiffs and appellants may recover costs of this appeal.

SHARPE, C. J., and NORTH and BUTZEL, JJ., concurred with CHANDLER, J. McALLISTER, J., took no part in the decision of this case.